(No. 75608.—

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MAURICE McDONALD, Appellant.

*Opinion filed October 19, 1995.—Rehearing denied January 29, 1996.*

424

Charles M. Schiedel, Deputy Defender, of Springfield, and Steven L. Clark, Assistant Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant, and Maurice McDonald, of Ely, Nevada, appellant *pro se.*

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb and Michelle Katz, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE BILANDIC delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, defendant, Maurice McDonald, was convicted of two counts of murder and one count of armed robbery. (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a), 18—2(a).) The jury found defendant eligible for the death penalty based upon the statutory aggravating factor of murder of two or more individuals. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(3).) The same jury then found that there were no mitigating factors sufficient to preclude imposition of the death sentence. Accordingly, the trial judge sen-

tenced defendant to death for the murders and to 60 years' imprisonment on the armed robbery count.

Defendant's death sentence has been stayed pending direct review by this court. (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).) For the reasons that follow, we affirm defendant's convictions and sentences.

## SUMMARY OF FACTS

On the evening of February 27, 1983, Lester Coats was at his home located at 530 East 86th Place in Chicago. Also at Lester's home that evening were the following individuals: Barbara Coats Terrell (Lester's daughter), Althea (Barbara's daughter), Deneen Coats (Lester's granddaughter), Clarence Coats (Lester's son), and defendant. Lester was a drug dealer and defendant was employed as his "bodyguard/gofer." That evening, Lester and his daughter Barbara counted the proceeds from drug sales, which totaled $13,000. Lester subsequently placed the money in a little metal box which he locked and stored in the hall closet. According to Barbara, this was an unusual place for Lester to store anything because he generally kept his money in the bedroom closet. In addition to money, Lester also kept other items in the bedroom closet, including jewelry, guns, and food stamps, all of which were received in exchange for drugs.

Barbara further testified that Lester's girlfriend, Brenda Robertson, arrived at the house around 11:30 p.m. By 1:30 a.m., everyone had departed, leaving Lester and Brenda alone in the house.

At approximately 4:40 a.m. on February 28, 1983, Officer William Tuck responded to a call of a "man down" at 530 East 86th Place. When he arrived, he found Lester bleeding on the sidewalk in front of his house. At the time, Lester appeared to be alive. Officer Tuck followed a trail of blood to the house and went inside. The front door was unlocked and there were no signs of forced entry.

Sergeant Peter Dignan next arrived on the scene to find paramedics working on Lester. After noticing a large amount of blood on the sidewalk, he proceeded inside the house. Sergeant Dignan testified that there was blood on the walls and floor. He also noticed that the house had been ransacked. In the kitchen, Sergeant Dignan discovered that the wires to the alarm were severed. He also recovered a bloodstained knife from the kitchen sink. Sergeant Dignan then followed the trail of blood to the basement. In the basement, Sergeant Dignan found the lifeless body of Brenda Robertson. Brenda had an electrical cord wrapped around her ankles and wrist, and multiple stab wounds to her body. Sergeant Dignan also noticed that there was a fur coat on the floor with five food stamps lying on it.

Doctor Mitra Kalelkar of the Cook County medical examiner's office performed the autopsies on Lester and Brenda. The autopsy on Lester revealed that he had died because of multiple stab wounds, including a stab wound that perforated his heart. Dr. Kalelkar testified that this wound was so serious that a person so injured would collapse in approximately five minutes from the time that the injury was inflicted. Brenda also had multiple stab wounds, including an incised wound around the left nipple of her breast. Brenda's heart had been perforated as a result of the injuries inflicted on her. She too died as a result of multiple stab wounds. According to Dr. Kalelkar, both Lester's and Brenda's wounds were consistent with a theory of one instrument, such as a knife, having been used on both victims.

Rosemary Small, defendant's girlfriend, testified that defendant arrived at her home in the early morning hours of February 28, 1983. Small was uncertain of the exact time that defendant arrived. She could only place it at sometime between 2 and 4 a.m. Defendant awoke Small and told her that they had to get out of

the house because someone had shot at him. Before leaving, Small noticed some jewelry, food stamps, and two guns on the kitchen table. These items had not been there earlier. Defendant instructed her to put the jewelry and food stamps in her purse. Defendant then drove Small and her son to his cousin Janice Thomas' house.

Thomas testified that defendant arrived at her home on February 28, 1983, at approximately 5 a.m. Defendant brought his clothes wrapped in a sheet, and a rifle. Defendant left those items with Thomas. After unwrapping the sheet, Thomas found clothing, a telephone and two guns. A few days later, the police went to Thomas' house after receiving a call about the weapons. Thomas voluntarily turned the two guns and the rifle over to the police. The items recovered included a Winchester rifle, a .38-caliber Llama revolver, and a .44-caliber Smith and Wesson revolver.

On March 3, 1983, Sergeant Dignan and Detective John Yucaitis located Small at her mother's apartment and took her to police headquarters. After being questioned, Small told the police that defendant gave her food stamps and jewelry the morning of the murders. The food stamps and jewelry were recovered from her purse. The serial number on some of the food stamps recovered from Small's purse corresponded to the serial number on a food stamp recovered from Lester's basement. Officer Fred Harris, a latent fingerprint examiner, established that defendant's palmprint was found on the food stamp recovered from Lester's basement.

The weapons recovered from Thomas' house and the jewelry recovered from Small's purse were subsequently identified by various members of the Coats family as having been Lester's property. Barbara Coats Terrell testified that when she went to Lester's house a few days after the murder she did not find any of his jewelry, food stamps, or money in the house.

The State then rested its case, and defendant, acting *pro se*, presented his case in chief.

Defendant testified in his own behalf. In 1982, Lester hired him as a bodyguard. Lester paid defendant $100 a day in cash and $25 a day in food stamps, which he gave to his family.

On February 28, 1983, Lester gave defendant $600 and $200 in food stamps. Lester also instructed defendant to take $2,000 to $3,000 in food stamps to a grocery store for a cash redemption. Consequently, defendant insisted that there were no food stamps in Lester's house that day. Later that evening, between 8 and 9 p.m., Lester asked defendant to purchase some cocaine for Lester's personal use. Upon defendant's return to Lester's home, Brenda Robertson was there. Defendant left Lester's home around 10 p.m. Before leaving, defendant warned Lester not to open the door for anybody since there was money in the house. Defendant admitted being aware of the $13,000 in the house that night. However, he claimed that $13,000 was a small amount of money.

After leaving Lester's house, defendant stated that he went to his apartment on 68th Street to gather his belongings to move them to his new apartment at 79th and State. An unknown person started shooting at him. Defendant shot back with his .38 Llama revolver. Following this incident, defendant went to his uncle's house about 12:30 a.m.

After leaving his uncle's house, defendant went to Small's house about 2 a.m. Defendant then took Small to Thomas' house along with all of the things that he was going to take to the 79th and State apartment. Defendant denied giving Small any jewelry or food stamps on the morning of February 28, 1983. According to defendant, the jewelry recovered from Small belonged to Small. Moreover, defendant stated that the weapons recovered from Thomas' house belonged to defendant.

Defendant next went to Lester's house between 6 and 7 a.m., but left when he saw the police. Defendant believed that Lester was arrested for narcotics. Later he found out that Lester was dead and that the police were looking for him.

As a final matter, defendant presented his theory regarding the murder. First, he pointed out that he and Lester were friends. Defendant claimed to love Lester and that he had no reason to harm him. Instead, defendant contended that Lester opened the door for Arlene Williams, Lester's common law wife. A fight arose in which Brenda stabbed Lester and ran into the basement where Lester subsequently murdered her. Some unknown person then came into the house and stabbed Lester and searched his house for the money.

In addition to his own testimony, defendant presented the testimony of his family members and a fingerprint expert. Defendant's family members stated that the jewelry belonged to Small and the weapons belonged to defendant. Doctor Mark Boese, a fingerprint expert, reexamined the physical evidence. He testified that there were unidentifiable prints found at the murder scene. However, he acknowledged that the food stamp found at the scene contained defendant's palmprint.

At the close of the evidence and arguments, the court found defendant guilty of the murders of Lester Coats and Brenda Robertson, and the armed robbery of Lester Coats. At sentencing, defendant elected to proceed with a jury. The jury found defendant eligible for the death penalty under the statutory aggravating factor of murder of two or more individuals. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(3).) After hearing the testimony of several witnesses at the sentencing phase of the trial and being instructed on the evidence, the jury found no mitigating factors sufficient to preclude

the imposition of a death sentence. Accordingly, the judge sentenced defendant to death for the murders of the two victims. The court also sentenced defendant to 60 years of incarceration on the armed robbery conviction.

We will discuss additional relevant facts in the context of the issues raised on appeal.

## ANALYSIS

Initially, we address the State's motion to strike defendant's *pro se* brief. This motion was taken with the case. The State contends that, since the State Appellate Defender's office was appointed to represent defendant on appeal, defendant's *pro se* brief is inappropriately before this court. In support of this argument, the State maintains that defendant does not have a right to be represented by counsel *and* to conduct portions of the proceedings on his own. We agree with the State that a defendant has no right to both self-representation and the assistance of counsel. (*People v. Williams* (1983), 97 Ill. 2d 252, 267, quoting *People v. Ephraim* (1952), 411 Ill. 118, 122.) Here, defendant is represented by counsel on appeal. Defense counsel has submitted a brief on behalf of defendant. Consequently, defendant in this case has no right to present a *pro se* brief in addition to his counsel's brief. Nevertheless, given that defendant's life is at stake, we will consider the arguments addressed in defendant's *pro se* brief. (See *People v. Gacy* (1988), 125 Ill. 2d 117, 133-34.) Accordingly, the State's motion is denied.

## PRETRIAL ISSUES

In both his *pro se* brief and the brief submitted by defense counsel, defendant challenges the validity of his prosecution under the interstate agreement on detainers act (act) (730 ILCS 5/3—8—9 (West 1992)). Defense counsel's brief argues that the delay between defendant's

arrival in Illinois and the date of his trial violated the 120-day rule under article IV of the act. Defendant's *pro se* brief also makes that argument, and additionally contends that the delay between defendant's Nevada conviction and his subsequent trial in Illinois violated the 180-day rule under article III of the act.

We first address the argument based on article III of the act. Article III provides in pertinent part:

"(a) Whenever a person has entered upon a term of imprisonment in *** a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment *** on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within 180 days *after he shall have caused to be delivered to the prosecuting officer and the appropriate court *** written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment ***.* The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner.

(b) The written notice and request for final disposition referred to in paragraph (a) hereof shall be given or sent by the prisoner to the warden, commissioner of corrections or other official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested." (Emphasis added.) 730 ILCS 5/3—8—9 (West 1992).

It is evident from the language of article III that the 180-day period during which a defendant-prisoner must be brought to trial does not commence to run until after certain procedural requirements have been satisfied. Once a detainer has been lodged against a defendant-

prisoner, he is required to give or send a written notice of the place of his imprisonment and a request for final disposition to the warden, who then forwards that information with the requisite certificate to the appropriate prosecutor and court. (730 ILCS 5/3—8—9 (West 1992).) Consequently, article III requires a defendant-prisoner to initiate the procedures before the 180-day requirement will apply. *People v. Uplinger* (1977), 69 Ill. 2d 181, 187.

In this case, an arrest warrant had been issued in Illinois against defendant on July 3, 1986. Defendant was subsequently convicted of an unrelated murder in Nevada on March 13, 1990, and sentenced to life imprisonment without the possibility of parole. On November 15, 1991, defendant was taken into custody in Nevada by two Chicago police officers, who transported him to Illinois. The record is silent as to what transpired between March 13, 1990, and November 15, 1991. The record does not suggest that defendant sent a written notice and request for final disposition of this case. In view of the foregoing, we find that defendant has failed to show that he substantially complied with the statutory requirements of article III. We therefore conclude that the 180-day rule was not activated because defendant failed to substantially comply with the provisions of article III. See *Uplinger*, 69 Ill. 2d at 188-90; see also *People v. Montague* (1989), 182 Ill. App. 3d 737, 756; *People v. Merryfield* (1980), 83 Ill. App. 3d 1017, 1021.

We next address defendant's argument that his prosecution violated article IV of the act (730 ILCS 5/3—8—9 (West 1992)). Article IV provides that when an Illinois prosecutor obtains temporary custody to prosecute a person against whom a detainer has been filed in another State, that person shall be tried within 120 days of his arrival in Illinois "but for good cause *** the court *** may grant any necessary or reasonable continu-

438

ance." (730 ILCS 5/3—8—9 (West 1992).) Defendant argues that he was denied his right to a "speedy trial" under article IV because more than 120 days elapsed from his arrival in Illinois until the date of trial. The State responds that defendant was brought to trial well within the 120-day period established by article IV where the running of the statutory period was suspended due to continuances that resulted from defendant's actions.

Initially, we note that the 120-day period under article IV is tolled where a necessary or reasonable continuance is granted for good cause. (*Neville v. Friedman* (1977), 67 Ill. 2d 488, 493.) In determining whether the 120-day period of article IV should be tolled, we look for guidance to the Illinois speedy-trial statute (725 ILCS 5/103—5 (West 1992)) and cases interpreting its provisions. See *People v. Christensen* (1984), 102 Ill. 2d 321, 329.

Section 103—5(a) of the Illinois speedy-trial statute provides that "[e]very person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant." (725 ILCS 5/103—5(a) (West 1992).) A delay is held to be occasioned by a defendant when a defendant's acts caused or contributed to a delay resulting in the postponement of trial. (*People v. Turner* (1989), 128 Ill. 2d 540, 550; *People v. Reimolds* (1982), 92 Ill. 2d 101, 106; *People v. Donalson* (1976), 64 Ill. 2d 536, 541; *People v. Nunnery* (1973), 54 Ill. 2d 372, 376.) In resolving whether a delay is attributable to a defendant, a trial court's determination is entitled to much deference, and should be sustained absent a clear showing of an abuse of discretion. (*People v. Bowman* (1990), 138 Ill. 2d 131, 137; *Turner*, 128 Ill. 2d at 550-51; *Reimolds*, 92 Ill. 2d at 107.) Any period of delay found to be occasioned by a de-

fendant tolls the 120-day period under the speedy-trial statute. (725 ILCS 5/103—5(f) (West 1992); *Donalson*, 64 Ill. 2d at 540; see *People v. Staten* (1994), 159 Ill. 2d 419, 433; *Reimolds*, 92 Ill. 2d at 106.) With these principles in mind, we now examine them in relation to the 120-day provision under article IV of the Act.

As noted above, defendant was transported from Nevada to Illinois by Chicago police officers on November 15, 1991. Pursuant to article IV, the 120-day period commenced on that date. Defendant ultimately was brought to trial for the murders and other offenses as set forth in the indictments with respect to Lester Coats and Brenda Robertson on June 10, 1992. Between the date of defendant's arrival in Illinois and his trial, 209 days had elapsed. Both parties agree that from November 15, 1991, to January 7, 1992, a 53-day period elapsed which was not attributable to defendant. Both parties also agree that from May 18, 1992, to June 10, 1992, a 23-day period elapsed which was not attributable to defendant. Consequently, there is no dispute that at least 76 days of the 120-day period had run before defendant was brought to trial. Moreover, defendant concedes that the 120-day period was suspended for 27 days between February 6, 1992, and March 4, 1992. Defendant acknowledges that delay as being necessary and reasonable because it resulted from the court's ordering of an examination of defendant to determine his fitness to stand trial. (See 730 ILCS 5/3—8—9 (West 1992).) The dispute therefore centers on whether three separate periods of pretrial delay, which amount to 106 days, should be counted in determining whether defendant was tried within 120 days of his arrival in Illinois.

The first period is the 30 days between January 7, 1992, and February 6, 1992. On January 7, 1992, defendant filed a *pro se* motion to quash his arrest and to suppress evidence. Since defendant's appointed attorney

was not present, the case was continued by agreement to January 9, 1992. On January 9, 1992, the court considered defendant's previously filed motion and recommended that defendant and his appointed attorney work on that motion. The court also instructed defendant and his appointed attorney to prepare their case. To assist them in this matter, the court found that it was necessary to give the parties time to initiate the discovery process. The case was continued by agreement to February 6, 1992.

Defendant asserts that the 120-day period was not tolled from January 7, 1992, to February 6, 1992, because his motion was ultimately withdrawn on May 18, 1992. We disagree. Any delay resulting from a defendant's filing of a motion to suppress evidence is properly attributable to defendant for speedy-trial purposes. (*People v. Jones* (1984), 104 Ill. 2d 268, 277; *Donalson*, 64 Ill. 2d at 541-42.) Even if a motion is subsequently withdrawn, a defendant is charged with the time associated with processing the motion, including time for the State to respond and the time necessary for the court to hear and decide the issues. (*Jones*, 104 Ill. 2d at 280; see *People v. Lendabarker* (1991), 215 Ill. App. 3d 540, 553; *People v. DeCarlis* (1980), 88 Ill. App. 3d 634, 637-38.) Regardless of the disposition of a motion, it has been held that the mere filing of a motion eliminates the possibility that the case could be immediately set for trial. (*Donalson*, 64 Ill. 2d at 542.) Consequently, any delay resulting from this defendant's filing of his motion is attributable to him. Here, the continuance of the case to permit defendant to consult with his appointed counsel and to allow discovery to begin was directly attributable to defendant's motion. Under the circumstances, the delay resulted from a necessary and reasonable continuance that was granted for good cause. In accordance with article IV of the act, the 120-

day period was tolled from January 7, 1992, to February 6, 1992.

The second period at issue is the 20 days between March 4, 1992, and March 24, 1992. On March 4, 1992, defendant filed additional *pro se* motions including a motion for the appointment of a bar association attorney and a petition for *habeas corpus* relief, which alleged a violation of the 120-day period of the act. Although the motion for the appointment of a bar association attorney was denied that same day, other *pro se* motions, including a motion to quash his arrest and to suppress evidence, a motion for a bill of particulars, which was filed on February 6, 1992, and a motion to dismiss, which alleged a violation of the speedy-trial provision of the act and which was also filed on February 6, 1992, were still on file. The court gave the State additional time to answer the new and existing motions. The case was continued to March 24, 1992.

Once again the delay was caused by defendant's filing of motions. A delay caused by a defendant's filing of motions is ordinarily chargeable to a defendant. (*Jones*, 104 Ill. 2d at 277.) Since the continuance resulted from defendant's filing of new motions, it constituted good cause to provide the State with additional time to respond. Therefore, the 20 days during this period should not be computed in the 120-day period under article IV of the act.

The third and final period at issue involves 56 days between March 24, 1992, and May 18, 1992. On March 24, 1992, and May 18, 1992, the court ordered defendant to submit to the taking of palmprints. Apparently, due to a disfigurement to defendant's hand, it was difficult for the police department to obtain defendant's fingerprints. Consequently, it was necessary and reasonable for the court to order the taking of defendant's palmprints. Furthermore, one of the major pieces of evidence

relied on by the State to convict defendant was the presence of his palmprint on a food stamp found at the scene of the crime. We find that a continuance for the purpose of obtaining defendant's palmprints constitutes good cause for a continuance where key evidence linking defendant to the crime had to be analyzed and compared with defendant's prints. The running of the 120-day period was thereby tolled during this delay in the case.

In summary, in the three time periods we have examined, the continuances which were granted for good cause totaled 106 days: 30 days from January 7, 1992 to February 6, 1992; 20 days from March 4, 1992, to March 24, 1992; and 56 days from March 24, 1992, to May 18, 1992. Pursuant to article IV of the act, we hold that the requisite 120-day period was tolled during these periods. As previously mentioned, it was also tolled during the 27 days between February 6, 1992, and March 4, 1992. Subtracting these 133 days from the total delay of 209 days between defendant's arrival in Illinois and the commencement of trial leaves a total of 76 days, well below the 120-day limit set by article IV.

We further point out that, following defendant's trial, the trial court denied defendant's motion to dismiss, which alleged a speedy-trial violation of the act. The court found that, under the law, the appropriate actions were taken within an appropriate period of time. A trial court's ruling on a motion to dismiss is entitled to much deference and will be sustained absent a clear showing that the court abused its discretion. (*Bowman*, 138 Ill. 2d at 136-37.) In light of the foregoing analysis, we find that the trial court did not abuse its discretion in denying defendant's motion to dismiss. Accordingly, we hold that defendant was brought to trial within the 120-day period prescribed by article IV of the act.

Defendant has also filed a *pro se* motion for sanctions based upon these same arguments. This motion

was taken with the case. In this motion, defendant charges that the State violated ABA Disciplinary Rule 7—105(A) by threatening criminal prosecution to gain an advantage in a civil matter, which was pending in the United States Court of Appeals for the Ninth Circuit. (ABA Model Code of Professional Responsibility DR 7—105(A) (1984).) In support of his argument, defendant relies on the State's alleged violation of the 180-day and 120-day rules set forth respectively in articles III and IV of the act. Given our holding above, defendant's argument is without merit. Defendant further contends that the State failed to disclose certain evidence that negated his guilt. We find that the alleged evidence referred to by defendant is not a part of the record in this appeal, and this issue is thus beyond the scope of our review. Defendant's motion for sanctions is therefore denied.

### TRIAL ISSUE

Defendant argues that the State did not prove him guilty of the murders beyond a reasonable doubt. Defendant maintains that he was not sufficiently proven guilty because the circumstantial evidence left serious doubts as to who committed the murders. In essence, defendant attacks the sufficiency of the evidence against him.

The standard of review on a challenge to the sufficiency of the evidence in a criminal proceeding is well-established. When presented with a challenge to the sufficiency of the evidence against the accused, it is not the function of this court to retry the defendant. (*People v. Phillips* (1989), 127 Ill. 2d 499, 509; *People v. Sanchez* (1986), 115 Ill. 2d 238, 260-61; *People v. Collins* (1985), 106 Ill. 2d 237, 261.) Rather, the relevant inquiry on review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt." (Emphasis in original.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Campbell* (1992), 146 Ill. 2d 363, 374; *Sanchez*, 115 Ill. 2d at 261; *Collins*, 106 Ill. 2d at 261.) This reasonable doubt standard is applicable in reviewing the sufficiency of evidence in all criminal cases, regardless of whether the evidence is direct or circumstantial. (*Campbell*, 146 Ill. 2d at 374; *People v. Herrett* (1990), 137 Ill. 2d 195, 203; *People v. Pintos* (1989), 133 Ill. 2d 286, 291.) This court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Campbell*, 146 Ill. 2d at 375; *People v. Fields* (1990), 135 Ill. 2d 18, 48; *People v. Young* (1989), 128 Ill. 2d 1, 51; *Sanchez*, 115 Ill. 2d at 260; *Collins*, 106 Ill. 2d at 261.

Moreover, "[c]ircumstantial evidence is sufficient to sustain a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged." (*Campbell*, 146 Ill. 2d at 379.) It is not necessary that the trier of fact be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. (*People v. Jones* (1985), 105 Ill. 2d 342, 350.) Instead, it is sufficient if all the evidence satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *Jones*, 105 Ill. 2d at 350.

Our review of the record reveals that a rational trier of fact could have found defendant guilty of the murders beyond a reasonable doubt. The circumstantial evidence upon which the State relied at trial included defendant's palmprint at the scene of the crime, defendant's possession of property alleged to have belonged to victim Lester Coats, and defendant's flight from Illinois following the murders.

This evidence was sufficient to allow the trier of fact to find defendant guilty beyond a reasonable doubt.

First, defendant's palmprint was found on a food stamp at the scene of the crime. Clarence Coats and Barbara Coats Terrell testified that when they left their father's house on February 28, 1983, there were no food stamps lying on the floor. Sergeant Peter Dignan, however, testified that when he arrived at the scene of the crime he found food stamps on a fur coat lying on the basement floor near Brenda Robertson's body. Both experts for the State and the defense agreed that defendant's palmprint was on one of the food stamps found on the floor by Sergeant Dignan. In addition, Rosemary Small testified that defendant gave her food stamps on the morning of the murders. It was also established at trial that the food stamps found at the scene had the same serial number as those defendant had given to Small.

Defendant urges that there are other valid explanations for the presence and location of his palmprint on the food stamp found at Lester Coats' house. According to defendant, the palmprint cannot be said to have been made by him at the time of the crime and the food stamps need not have been placed there at the time of the crime. In support of his argument, defendant points out that Lester Coats accepted food stamps in exchange for drugs and paid defendant in part with food stamps. Defendant thus claims that, given the presence of food stamps in Lester Coats' house and defendant's contact with them there, his palmprint on a food stamp is not surprising.

This court has held that a conviction may be sustained solely on the basis of fingerprint evidence, where a defendant's fingerprints have been found in the immediate vicinity of the crime under such circumstances as to establish beyond a reasonable doubt that they were impressed at the time of the commission of the crime. (*Campbell*, 146 Ill. 2d at 386; *People v. Yates* (1983), 98 Ill. 2d 502, 525; *People v. Rhodes* (1981), 85 Ill. 2d 241,

249.) This time/placement requirement should also exist for palmprint evidence. (See *Campbell*, 146 Ill. 2d at 387 (time/place requirement applies to shoeprint evidence).) The State, however, is not required to negate every conceivable possibility that the print was impressed at some time other than during the commission of the offense. (*Campbell*, 146 Ill. 2d at 387.) In some cases, evidence of the particular location of the fingerprint satisfies the time/placement criterion. (*Campbell*, 146 Ill. 2d at 387.) In addition, this court has held that attendant circumstances can support an inference that the print was made at the time the offense was committed. *Campbell*, 146 Ill. 2d at 387.

We find that there are sufficient attendant circumstances here to support the inference that the palmprint was made by defendant at the time the murders were committed. As previously noted, there were no food stamps on the floor of Lester Coats' house prior to the murders. Following the murders, food stamps were found on the floor near Brenda Robertson's body. Furthermore, one of the food stamps near Brenda's body contained defendant's palmprint. The serial number on those food stamps corresponded to the serial number on food stamps given to Rosemary Small by defendant on the day of the murders. A logical inference from this evidence is that defendant's palmprint was made on the food stamp at the time the murders were committed. Thus, this evidence supports a guilty verdict.

In addition to defendant's palmprint, the State also relied upon defendant's possession of jewelry and guns. Witnesses testified that, on the day of the murder, defendant had in his possession gold chains, a charm, two hand guns, and a rifle. Members of Lester Coats' family identified some of the items as belonging to Lester. The State contends that this allows the inference that defendant took these items as part of the murders. Defendant

contends that this evidence allows for other plausible explanations for defendant's possession of this property.

Where evidence is presented and such evidence is capable of producing conflicting inferences, it is best left to the trier of fact for proper resolution. (*Campbell*, 146 Ill. 2d at 380; *Yates*, 98 Ill. 2d at 524.) When weighing the evidence, the trier of fact is not required to disregard inferences that flow from the evidence, nor is it required to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. (*Campbell*, 146 Ill. 2d at 380; *Rhodes*, 85 Ill. 2d at 249.) Here, the trial court found that when testimony regarding the jewelry and guns is taken in conjunction with Rosemary Small's and Janice Thomas' testimony as to when and how the items were brought to their respective homes, it is a reasonable inference that such property was taken from Lester Coats' house. We find no reason to reverse the trial court's finding regarding this evidence.

In conjunction with the preceding evidence, the State also presented evidence of defendant's flight from Illinois following the murders. Although defendant knew that Lester Coats was dead and that the police were looking for him, he disappeared. Detectives Steven Brownfield and Daniel McWeeny testified that police attempts to locate defendant failed. Defendant's flight from Illinois was further attested to by his family members and girlfriend, who had not seen defendant since 1983. Based upon this evidence, the trial court found that defendant fled Illinois because of his involvement in the murders.

Defendant maintains that his flight was not to avoid prosecution. Rather, defendant explains that he did not contact the police because Lester Coats, his employer, was a drug dealer and defendant was reluctant to tell police of his employment in the drug dealing business.

He claims that, given his involvement in the drug dealing business, he was concerned for his personal safety. Also, defendant points out that he did not return to any of his residences because someone had shot at him near his apartment on the day of the murders.

While evidence of flight by itself is not sufficient to establish guilt, it is a circumstance from which a trier of fact may infer consciousness of guilt. (See *People v. Harris* (1972), 52 Ill. 2d 558, 561.) Consequently, a trier of fact may consider a defendant's flight with other factors tending to establish guilt. (*Campbell*, 146 Ill. 2d at 388; *People v. Brown* (1963), 27 Ill. 2d 23, 26.) Although defendant here attempts to explain or excuse his flight, it was a reasonable inference that defendant was conscious of his own culpability. In sum, the evidence presented against defendant was more than sufficient to establish defendant's guilt beyond a reasonable doubt. The trial court's finding of guilt must therefore be sustained.

Defendant also contends that the evidence was insufficient because there was testimony establishing that he was elsewhere when the murders occurred. It is uncontested that Lester Coats received his fatal wound to the heart between 4:30 and 4:35 a.m. on February 28, 1983. Rosemary Small testified that defendant arrived at her house between 2 and 4 a.m. on February 28, 1983. Janice Thomas testified that defendant and Small arrived at her house around 5 a.m. on that date. Defendant contends that he could not have committed the murders because the testimony of Small and Thomas establishes that he was either in Small's house or driving between Small's and Thomas' house at approximately 4:30 a.m.

In this case, resolution of the question of defendant's guilt or innocence depends upon the credibility of witnesses and the weight to be given to their testimony. It is the trier of fact's responsibility to determine the cred-

ibility of the witnesses and the weight to be given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence. (*Fields,* 135 Ill. 2d at 46, 48; *Sanchez,* 115 Ill. 2d at 261; *People v. Akis* (1976), 63 Ill. 2d 296, 298.) This court will not substitute its judgment for that of the trier of fact on these matters. *Campbell,* 146 Ill. 2d at 375; *Fields,* 135 Ill. 2d at 48; *Young,* 128 Ill. 2d at 51; *People v. Johnson* (1986), 114 Ill. 2d 170, 190.

In this case, the trial court accepted the findings of the experts placing the time of Lester Coats' stabbing at 4:30 or 4:35 a.m. The trial court further considered, but rejected, defendant's claim that Small's and Thomas' testimony necessitated a finding of innocence. That determination was entirely supported by the record. Nothing in Small's or Thomas' testimony compels the reversal of defendant's conviction. Small and Thomas merely estimated the time that they saw defendant. Neither witness testified that the time of defendant's arrival was based on anything in particular. More importantly, the time that Thomas gave was after the murders were committed. Consequently, even if defendant did arrive at Thomas' home sometime around 5 a.m., this did not preclude a finding that defendant committed the murders, went to Small's house, and then proceeded to Thomas' house. Although the testimony of Small and Thomas is capable of producing conflicting inferences, we cannot say that the trial court's resolution of such testimony is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt as to defendant's guilt.

Given all of the evidence adduced at trial, and reviewing it in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found defendant guilty of the murders beyond a reasonable doubt.

## SENTENCING ISSUES

### A

Defendant contends that the State failed to prove beyond a reasonable doubt the existence of a statutory aggravating factor necessary to establish his eligibility for the death penalty. Specifically, defendant claims that the State failed to prove that he had been convicted of murdering two or more individuals with the requisite culpable mental state as required by section 9—1(b)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(3)). We find no merit to this contention.

Where the sentencing hearing is conducted before a jury, a defendant can be found eligible for the death penalty only if the jury unanimously finds that the State has proven beyond a reasonable doubt that defendant was at least 18 years of age at the time of the commission of the offense and that at least one statutory aggravating factor exists. (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(f), (g); *People v. Simms* (1991), 143 Ill. 2d 154, 169.) Here, defendant's eligibility for the death penalty was predicated upon the statutory aggravating factor set out in section 9—1(b)(3) of the Criminal Code (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(3)). Section 9—1(b)(3) authorizes the imposition of the death penalty where the defendant has been convicted of murdering two or more individuals and the deaths "were the result of either an intent to kill more than one person or of separate premeditated acts." (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(3).) In 1983, this court construed the language of section 9—1(b)(3) as including the mental state of knowledge as well as intent. (*People v. Davis* (1983), 95 Ill. 2d 1, 31-36.) Consequently, section 9—1(b)(3) allows the death penalty to be imposed where the defendant acted with knowledge that his acts would result in death or great bodily harm, or with the intent to kill. (*People v. Ramey* (1992), 152 Ill. 2d 41, 62.) Thus, the State was

required to prove not only defendant's conviction for two or more murders, but also a culpable mental state, namely intent or knowledge, at the time of those crimes. *People v. Edgeston* (1993), 157 Ill. 2d 201, 224.

In the instant case, defendant challenges the sufficiency of the evidence presented by the State during the eligibility phase of the sentencing hearing. Under such circumstances, the standard of review to be applied is whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements necessary to establish the defendant's eligibility for death beyond a reasonable doubt. (See *People v. Pasch* (1992), 152 Ill. 2d 133, 213-14.) We find that in this case a rational jury could have concluded that the State satisfied its burden of proving the requisite elements under section 9—1(b)(3) beyond a reasonable doubt.

At the eligibility phase of the sentencing hearing, the State first presented the testimony of Detective Steven Brownfield. Detective Brownfield testified that defendant's date of birth was July 2, 1955, and that defendant was convicted of the murders of Lester Coats and Brenda Robertson. Following Detective Brownfield's testimony, a certified copy of a court order finding defendant guilty of the murders of Lester Coats and Brenda Robertson and the armed robbery of Lester Coats was admitted into evidence. Here, the record reveals that defendant had been indicted and tried for the intentional, knowing and felony murder of Lester Coats, the armed robbery of Lester Coats, and the intentional and knowing murder of Brenda Robertson. Because the trial court entered a general finding of guilt and defendant was charged with intentional murder, defendant ultimately was found guilty of intentional murder. See *People v. Brackett* (1986), 144 Ill. App. 3d 442, 448 (where general verdict is entered, defendant is found

guilty as charged in each count); see also *People v. Johnson* (1994), 159 Ill. 2d 97, 129-30.

Next, the State presented the testimony of Officer John Yucaitis, who described the multiple stab wounds on the victims and the large amount of blood at the scene. Specifically, Officer Yucaitis testified that Lester Coats had several stab wounds in his back and chest. He also stated that Brenda Robertson was found lying on the floor in a pool of blood with her hands and feet tied with an electrical cord. Officer Yucaitis described the multiple stab wounds found on Brenda Robertson's back and chest, and a stab wound to the left nipple in her chest area. After hearing the evidence and being instructed on the applicable law, the jury unanimously found beyond a reasonable doubt that defendant was eligible for the death penalty.

After reviewing the aforementioned evidence in the light most favorable to the State, we find that a rational trier of fact could have found defendant eligible for death under section 9—1(b)(3). A jury could rationally conclude from the evidence presented by the State at the eligibility phase: (1) that defendant was at least 18 years of age when the offenses were committed, (2) that defendant was convicted of murdering two people, and (3) that defendant acted with intent to kill when he committed those murders. Accordingly, we reject defendant's claim that the State failed to establish his eligibility for death under section 9—1(b)(3).

Defendant argues further that the eligibility verdict must be reversed because the State introduced defendant's 1990 Nevada murder conviction but failed to prove his mental state with regard to that conviction. We need not address this argument because the Nevada murder conviction was not needed to establish defendant's eligibility for death. As noted above, a rational trier of fact could have found that the State established

defendant's eligibility for death pursuant to section 9—1(b)(3) based solely on defendant's convictions for the murders of Lester Coats and Brenda Robertson.

## B

Defendant next asserts that the trial court erroneously informed defendant that his mental state was irrelevant at the eligibility phase of the death penalty hearing and barred defendant from presenting evidence regarding his mental state. Specifically, defendant claims that the trial court erred in refusing to allow defendant to call Dr. Richard Viglione as a witness at the eligibility phase of the sentencing hearing. Defendant claims that Dr. Viglione's testimony would have established the time that Lester Coats was stabbed for the purpose of showing that defendant was not present at the scene of the crime when the murders occurred. The court ruled that the doctor's testimony was relevant at the second phase of the sentencing hearing, but irrelevant at the first phase. As a result, defendant claims that he was denied an opportunity to present evidence regarding his mental state and thereby rebut the State's evidence regarding eligibility.

At the eligibility phase of a sentencing hearing, only evidence having a direct impact on the statutory prerequisites for the death penalty should be admitted. (*Edgeston*, 157 Ill. 2d at 224; *Simms*, 143 Ill. 2d at 175; *People v. Brisbon* (1985), 106 Ill. 2d 342, 371.) Ultimately, the decision of whether to admit or exclude evidence at this stage of a sentencing hearing is left to the sound discretion of the trial court, whose decision will not be overturned on review absent a clear abuse of discretion. *Edgeston*, 157 Ill. 2d at 224; *Simms*, 143 Ill. 2d at 175.

As previously noted, the State sought to establish defendant's eligibility for the death penalty under section 9—1(b)(3). Here, Dr. Viglione's proposed testimony did not tend to negate any of the requirements of sec-

tion 9—1(b)(3). Defendant was not attempting to introduce Dr. Viglione's testimony to establish that he did not kill the victims with the requisite mental state. Rather, he sought to introduce Dr. Viglione's testimony to show that he did not kill the victims at all. We find that the trial court did not abuse its discretion in declaring that evidence attempting to establish some "residual doubt" regarding defendant's guilt was inappropriate at the eligibility phase of the sentencing hearing. (See *People v. Morgan* (1991), 142 Ill. 2d 410, 466-67, *rev'd on other grounds* (1992), 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222; *Edgeston,* 157 Ill. 2d at 244-45.) Reversal of defendant's sentence on this ground is not warranted.

## C

Defendant next argues that the trial court violated his Federal and State constitutional rights (U.S. Const., amend. VIII; Ill. Const. 1970, art. I, § 11), as well as the Illinois death penalty statute (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)), by interfering with the sentencing jury's consideration of residual doubt about defendant's guilt. Defendant partially attributes this interference to the trial court's denial of a defense instruction that listed "lingering doubt about defendant's guilt" as a mitigating factor. Defendant also claims that, because the trial court declined to answer the sentencing jury's question of whether residual doubt about guilt was a mitigating factor, the jurors believed that they were precluded from considering residual doubt. As a result, defendant contends that he was denied his right to have the sentencing jury consider residual doubt as a mitigating factor. Defendant's arguments are without merit.

This court has previously recognized the Supreme Court's rejection of the claim that a defendant convicted of a capital crime has a constitutional right under the eighth amendment to demand that the jury consider residual doubt over guilt at the sentencing phase.

*(People v. Edgeston* (1993), 157 Ill. 2d 201, 244-45, citing *Franklin v. Lynaugh* (1988), 487 U.S. 164, 172-73, 101 L. Ed. 2d 155, 165, 108 S. Ct. 2320, 2326-27; *People v. Fields* (1990), 135 Ill. 2d 18, 67.) This court has also adopted the Supreme Court's reasoning that residual doubt about a defendant's guilt is not a mitigating circumstance because it is not a fact about the defendant's character or the circumstances of the offense which might call for a penalty less than death. *(Fields,* 135 Ill. 2d at 67.) Consequently, a capital defendant has no constitutional right under the eighth amendment to have the sentencing jury consider residual doubt as a mitigating factor.

Although this court has adopted the Supreme Court's holding with respect to residual doubt in the context of the eighth amendment of the United States Constitution, the same reasoning applies under article I, section 11, of the Illinois Constitution. Article I, section 11, is the punishment provision of the Illinois Constitution just as the eighth amendment is the punishment provision of the United States Constitution. Defendant correctly points out that, when interpreting State constitutional provisions, this court is not bound by the Supreme Court's interpretation of similar Federal constitutional provisions. *(People v. DiGuida* (1992), 152 Ill. 2d 104, 118.) Rather, this court will consider the intent of the framers in determining how to construe State constitutional provisions. *(DiGuida,* 152 Ill. 2d at 118.) The record of proceedings from the Sixth Illinois Constitutional Convention clearly indicates the framers' understanding that article I, section 11 was synonymous with the cruel and unusual punishment clause of the eighth amendment to the United States Constitution. (3 Record of Proceedings, Sixth Illinois Constitutional Convention 1380-81.) As a result, article I, section 11 provides similar protections to those found under the

eighth amendment. Given this court's holdings with respect to residual doubt in the context of the eighth amendment, the same reasoning applies to defendant's claims under article I, section 11 of the Illinois Constitution. Therefore, defendant has no constitutional right under article I, section 11 of the Illinois Constitution to have the jury consider residual doubt.

Aside from his constitutional claims, defendant also contends that the Illinois death penalty statute provides for the consideration of residual doubt as a mitigating factor. We disagree. The Illinois death penalty statute requires the jury to consider any aggravating and any mitigating factors which are relevant to the imposition of the death penalty. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c).) It does not mandate the sentencing jury's consideration of residual doubt as a mitigating factor. Instead, it allows the sentencing body to consider any mitigating factors which are *relevant* to the imposition of the death penalty. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c).) Residual doubt is not relevant to the circumstances of the offense or the defendant's character. (See *Fields*, 135 Ill. 2d at 67.) As a result, it is not relevant to the imposition of the death penalty. Therefore, the Illinois death penalty statute does not support defendant's position that the sentencing jury must consider residual doubt.

Despite the fact that defendant does not have the right to have the jury consider residual doubt, we find that the trial court did not interfere with defendant's presentation of evidence regarding his innocence to the sentencing jury. Defendant was actually allowed to present evidence and argue his innocence to the sentencing jury. For example, Lester Coats, Jr., testified at the sentencing hearing that he had a heated argument with his father about a month before the murder. In addition, defendant testified that Brenda Robertson was

Lester Coats, Jr.'s girlfriend and that his father became involved with her to get back at his son for stealing business from him. Aside from allowing defendant to present evidence of residual doubt, the trial court instructed the sentencing jury that mitigating factors include "any other reasons supported by the evidence why the defendant should not be sentenced to death." This instruction allowed the sentencing jury to consider all reasons why defendant should not be sentenced to death, including residual doubt. (*People v. Sutherland* (1992), 155 Ill. 2d 1, 29.) As a result, the trial court did not preclude the sentencing jury from considering residual doubt. (*Fields*, 135 Ill. 2d at 68-69.) Under these circumstances, we conclude that defendant was not denied a fair sentencing hearing.

Defendant, however, submits the affidavits of two jurors to support his claim that the jurors believed that they were precluded from considering residual doubt as to defendant's guilt. Approximately one month after the sentencing verdict, jurors Gray and Lee signed affidavits in which they stated that they did not think they could consider reasonable doubts about defendant's guilt as a mitigating factor and as a result voted in favor of the death sentence. Now, defendant relies on these affidavits to impeach the sentencing jury's verdict. A statement by a juror taken after the jury has rendered its verdict, has been polled in open court, and has been discharged will not be admitted to impeach a juror's verdict. (*People v. Cabrera* (1987), 116 Ill. 2d 474, 491, citing *People v. Preston* (1979), 76 Ill. 2d 274, 288-89.) More specifically, an affidavit of a juror may not be used to show the " 'motive, method or process by which the jury reached its verdict.' " (*Preston*, 76 Ill. 2d at 288, quoting *People v. Holmes* (1978), 69 Ill. 2d 507, 511.) In view of the above mentioned principles, the jurors' affidavits should not be considered because they describe both jurors' motives for joining the verdict.

## D

In a related argument, defendant claims that he was prejudiced by the trial court's *ex parte* communication with the sentencing jury. During deliberations following the death penalty hearing, the jury sent a note to the trial court stating:

"Please specify what:

(1) Mitigating Factor

Any other reason supported by the evidence means? We are unclear on this one.

(2) Is questioning his guilt a mitigating factor?"

The trial judge informed the State and defendant's standby counsel about the note and the jury's questions. Although defendant was representing himself, the trial judge did not inform him of the jury's inquiry until after he had responded to the jury. The trial judge provided the following written response to the jury: "You have the instructions! Continue to deliberate." Defendant now argues that the trial judge's failure to consult him before responding to the jury deprived him of his constitutional right to be present at, and participate in, a critical stage of trial. Defendant also argues that the trial judge's failure to meaningfully respond to the jury's questions prejudiced him by interfering with the jury's consideration of evidence regarding his innocence.

The State responds by claiming waiver of this issue. According to the State, defendant waived this issue by his failure to raise it before the trial court and in any of defendant's post-sentencing motions. (*People v. Enoch* (1988), 122 Ill. 2d 176, 190-91.) Our review of the record reveals, however, that defendant did object to the trial judge's communication with the jury as soon as he was informed of it by the court. In addition, the post-sentencing motion raised this issue by pointing out the impropriety of the trial judge's response to the jury. Therefore, this issue is not waived.

Before addressing whether the trial judge's communication with the jury was prejudicial to defendant, we must first determine whether it was an *ex parte* communication. The State argues that a "true" *ex parte* communication did not occur because the trial judge consulted with defendant's standby counsel before responding to the jury's questions. Furthermore, shortly after the court's response was given to the jury, the trial judge discussed the jury's questions with defendant and thereby gave defendant the opportunity to participate in the proceedings. Consequently, defendant's right to participate in his defense was not violated and as such an *ex parte* communication did not occur. We disagree.

A criminal defendant has a constitutional right to a public trial, and to appear and participate *in person and by counsel* at all proceedings that involve his substantial rights. (U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8; *People v. Childs* (1994), 159 Ill. 2d 217, 227; see *People v. Mallett* (1964), 30 Ill. 2d 136, 141-42.) Furthermore, this court has held that a communication between the judge and the jury after the jury has retired to deliberate, except one held in open court and in defendant's presence, deprives defendant of those fundamental rights. (*Childs*, 159 Ill. 2d at 227, citing *People v. Beck* (1922), 305 Ill. 593, 596.) In the instant case, defendant's standby counsel was present when the trial judge informed him of the jury's note. However, defendant, who was representing himself, was neither present nor informed of the note until after the trial judge returned his response to the jury. Consequently, the trial judge communicated with the jury outside of defendant's presence during jury deliberations, which are a critical stage of the trial affecting a defendant's substantial rights. (*Childs*, 159 Ill. 2d at 234.) As a result, this *ex parte* communication between the judge

and the jury deprived defendant of his constitutional rights to be present at and to participate in a critical stage of trial. The trial judge therefore conducted an improper *ex parte* communication with the jury. See *Childs*, 159 Ill. 2d 217.

Having determined that an *ex parte* communication did in fact occur, the issue now becomes whether defendant suffered any prejudice as a result of this improper communication. A jury verdict will not be set aside where it is apparent that no injury or prejudice resulted from an *ex parte* communication. (*Childs*, 159 Ill. 2d at 227-28.) The burden, however, is on the State to prove that any error in the *ex parte* response to a jury's inquiry is harmless beyond a reasonable doubt. *Childs*, 159 Ill. 2d at 228, 234.

Here, in the trial judge's *ex parte* response to the jury, he declined to answer the jury's questions. Instead, he referred the jurors back to the original instructions. The original instructions informed the jurors that mitigating factors included "any other reasons supported by the evidence why the defendant should not be sentenced to death." This court has held that a trial court may exercise its discretion and properly decline to answer a jury's inquiries "where the instructions are readily understandable and sufficiently explain the relevant law, where further instructions would serve no useful purpose or would potentially mislead the jury, when the jury's inquiry involves a question of fact, or if the giving of an answer would cause the court to express an opinion which would likely direct a verdict one way or another." *Childs*, 159 Ill. 2d at 228.

In view of the foregoing, we find that defendant was not injured because the trial judge directed the jurors to rely on the original instructions. The instruction on mitigating factors, as set forth above, is readily understandable and sufficiently explains the law. An instruc-

tion allowing the jury to consider any reason supported by the evidence as to why the defendant should not be sentenced to death allows it to consider residual doubt and comports with Illinois law, and the eighth and fourteenth amendments. (*People v. Sutherland* (1992), 155 Ill. 2d 1, 29.) As a result, the jury in this case was able to consider any reason why defendant should not be sentenced to death before rendering its verdict. Given the clarity and sufficiency of the instruction on mitigation, defendant suffered no prejudice when the trial judge referred the jurors to that instruction. Therefore, the trial judge's *ex parte* communication to the jury, although improper, was harmless beyond a reasonable doubt. Reversal on this ground is not warranted.

### E

Defendant also challenges his death sentence on the ground that a juror's response during the trial judge's polling of the jury casts doubt on the unanimity of the sentencing verdict. The jury returned a verdict, signed by all the jurors, sentencing defendant to death. After the verdict was read, the jury was polled at the request of defendant. Each juror was asked, "Was this and is this now your verdict?" Eleven jurors replied in the affirmative. The following colloquy occurred between the court and the remaining juror:

"THE COURT: Ronald Gray, was this and is this now your verdict?

JUROR GRAY: Reluctantly, yes your Honor."

Defendant contends that juror Gray's response was hesitant and ambiguous, thereby raising a question about whether he truly assented to the verdict. According to defendant, this is further evidenced in juror Gray's subsequent affidavit that he was voting for death only because the court had led him to believe that doubts about defendant's guilt could not be considered as a mitigating factor. Defendant insists that, given juror

Gray's response, the trial judge had a duty to ascertain why juror Gray was reluctant. Based upon the foregoing, defendant urges that a question arises about the unanimity of the sentencing verdict.

The State points out that defendant never raised this issue before the trial court at the time the jury was polled. Any objection to the polling of jurors should be made at the time of the polling, and a failure to do so results in waiver. (*People v. Williams* (1983), 97 Ill. 2d 252, 308.) The issue of the trial court's polling of the jurors has thus been waived.

Nonetheless, defendant urges us to apply the plain error rule to review this alleged error. The plain error rule may be invoked in instances where the evidence at the sentencing hearing is closely balanced, or where the error is of such magnitude that it deprived the defendant of a fair proceeding. (*People v. Fields* (1990), 135 Ill. 2d 18, 60; *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.) We do not find the evidence at the second stage of defendant's sentencing hearing closely balanced. Nor do we find the alleged error so egregious as to have deprived defendant of his right to a fair sentencing hearing. We therefore reject defendant's contention that the purportedly improper polling of a juror amounted to plain error.

Even if defendant had properly preserved this issue for review, we are not persuaded by his argument. The purpose of polling a jury is to determine that a verdict accurately reflects each juror's vote as reached during deliberations and that the votes were not the result of force or coercion. (*People v. Cabrera* (1987), 116 Ill. 2d 474, 490; *Williams,* 97 Ill. 2d at 307.) When polling a jury, a trial court must not hinder a juror's expression of dissent. (*Cabrera,* 116 Ill. 2d at 490; *Williams,* 97 Ill. 2d at 307.) If a juror indicates some hesitancy or ambivalence in an answer, then the trial judge must

determine the juror's present intent by affording the juror the opportunity to make an unambiguous reply as to the juror's present state of mind. (*People v. Kellogg* (1979), 77 Ill. 2d 524, 528.) The trial judge, in determining whether a juror has freely assented to the verdict, hears the response and additionally observes the juror's demeanor and tone of voice during the course of polling the jury. (*Cabrera*, 116 Ill. 2d at 490.) A trial court's determination regarding a juror's voluntariness of his assent to the verdict will not be set aside unless the trial court's conclusion is clearly unreasonable. *Cabrera*, 116 Ill. 2d at 490.

Here, juror Gray's response is not equivocal and does not support a theory of coercion or possible dissent from the verdict. Any juror might feel "reluctance" about passing judgment in a case involving a death sentence. Under the circumstances, it was not clearly unreasonable for the trial judge to accept juror Gray's assent to the verdict as voluntary without conducting further questioning. (*Cf. Kellogg*, 77 Ill. 2d at 529-30 (where this court held that the trial judge's failure to answer the juror's question as to whether or not she could change her vote and his total refusal to address himself to the question was improper and therefore undermined the verdict).) Furthermore, defendant's reliance on juror Gray's subsequent affidavit as support for his argument is improper. As set forth above, use of a juror's affidavit taken after the jury has rendered its verdict, has been polled, and has been discharged is improper to impeach a verdict. In light of the foregoing, we find that the jury's verdict sentencing defendant to death was unanimous. We conclude that the trial court's polling of the jury does not require reversal of defendant's sentence.

## CONSTITUTIONALITY OF THE ILLINOIS DEATH PENALTY STATUTE

As a final matter, defendant raises a number of chal-

lenges to the constitutionality of the Illinois death penalty statute. We decline defendant's invitation to revisit the following arguments: (1) the death penalty statute places a burden of proof on the defendant that precludes meaningful consideration of mitigation (*People v. Johnson* (1993), 154 Ill. 2d 356, 373; *People v. Bean* (1990), 137 Ill. 2d 65, 138); (2) the death penalty statute allows the sentencer to consider a vague aggravating factor, namely any other reason why a defendant should be sentenced to death (see *People v. Young* (1989), 128 Ill. 2d 1, 59; *People v. Orange* (1988), 121 Ill. 2d 364, 390-91); and (3) the death penalty statute does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences (see *People v. Whitehead* (1987), 116 Ill. 2d 425, 465; *People v. Albanese* (1984), 104 Ill. 2d 504, 541-42). This court has previously considered and rejected these arguments. Defendant offers no persuasive reason for this court to reconsider its prior decisions.

Accordingly, we find no merit to defendant's challenges to the constitutionality of the Illinois death penalty statute.

## CONCLUSION

For the reasons set forth above, we affirm defendant's convictions and sentences. We direct the clerk of this court to enter an order setting Tuesday, January 16, 1996, as the date on which the sentence of death, entered by the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law. (Ill. Rev. Stat. 1991, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of this mandate to the Director of Corrections, to the warden of the Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*