# Illinois Official Reports

## Appellate Court

---

### *People v. Cross*, 2021 IL App (4th) 190114

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LATRON Y. CROSS, Defendant-Appellant. |
| District & No. | Fourth District<br>No. 4-19-0114 |
| Filed | October 21, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Vermilion County, No. 17-CF-476; the Hon. Nancy S. Fahey, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Christopher G. Evers, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Jacqueline M. Lacy, State's Attorney, of Danville (Patrick Delfino, David J. Robinson, and David E. Mannchen, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

Panel    JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justice Holder White concurred in the judgment and opinion.
Justice Cavanagh concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    In November 2018, a jury found defendant, Latron Y. Cross, guilty of the first degree murder of Ollie Williams. See 720 ILCS 5/9-1(a)(1), (2) (West 2016). The trial court sentenced defendant to 59 years in prison.

¶ 2    Defendant appeals, arguing the trial court erred because (1) defendant was not tried within 120 days of his arrest in violation of his statutory right to a speedy trial, (2) the State did not prove defendant guilty of first degree murder beyond a reasonable doubt, (3) the trial court denied defendant his constitutional right to present a defense when it barred him from presenting evidence that another man, Albert Gardner, made a video in which Gardner took credit for shooting Williams, and (4) the court improperly relied on aggravating factors unsupported by evidence and ignored factors in mitigation when it sentenced defendant.

¶ 3    We disagree and affirm.

¶ 4                                    I. BACKGROUND
¶ 5                    A. The Pretrial Proceedings Regarding Continuances
¶ 6    On July 9, 2017, defendant was charged, arrested, and jailed for the murder of Williams. Defendant was never released from custody.

¶ 7    On July 12, 2017, the trial court informed defendant of the charges, appointed the public defender, and set defendant's preliminary hearing for July 27, 2017. The court also set defendant's bond at $1 million.

¶ 8    On July 26, 2017, the State served upon defendant its motion for pretrial discovery. In its motion, the State requested the following:

> "an Order directing the Defendant and his attorney:
>
>     1. To give written notice to the People of the State of Illinois of any defenses, affirmative or non-affirmative, which the Defendant intends to assert at any hearing or at trial. RULE 413(d)
>
>     2. To furnish in writing to the People of the State of Illinois the names and last known addresses of persons the Defendant intends to call as witnesses, together with their relevant written or recorded statements, including memoranda reporting or summarizing their oral statements, and record of prior criminal convictions of such witnesses known to the defendant or his attorney. RULE 413(c)."

See Ill. S. Ct. R. 413(d)(iii) (eff. July 1, 1982) ("[I]f the defendant intends to prove an alibi, [he must furnish to the State] specific information as to the place where he maintains he was at the time of the alleged offense.").

¶ 9    On July 27, 2017, the trial court conducted defendant's preliminary hearing and found that the State had established probable cause, following which defendant agreed to a continuance.

That same day, the court made a docket entry in which it ordered that defendant had "30 days to respond to discovery."

¶ 10    Over the next year, defendant made six motions to continue on the following dates: September 13 and 21, 2017; November 20, 2017; and January 16, March 19, and June 18, 2018. The trial court granted all of those motions, each time attributing the delay to defendant. On June 18, 2018, when granting defendant's sixth and final motion for a continuance, the court scheduled a pretrial hearing for July 16, 2018.

¶ 11    On July 16, 2018, the trial court conducted a pretrial hearing, at which the court inquired about the status of the case. Defense counsel responded, "Your Honor, at this point I'm answering ready for trial and demanding speedy trial." The State responded that it was not ready and asked if the court "would be willing to set it on September 24th[, 2018]." The court agreed to that date and ruled that the delay was attributable to the State.

¶ 12    On August 21, 2018, defense counsel filed a document, titled "Supplemental Disclosure I to the Prosecution," in which he raised an alibi defense, identifying Naomi Cross, who was defendant's grandmother, as the alibi witness. Attached to the supplemental disclosure was a one-page report by an investigator, Steven Blaine, who had interviewed Naomi Cross.

¶ 13    Later that same day, the State responded to the alibi disclosure by filing a document titled "People's Response to Defense Motion Demand For Speedy Trial in Lieu of Defense Disclosure I on August 21, 2018" (People's Response). Therein, the State claimed that all of the information regarding the asserted alibi would have been known to defendant since July 12, 2017, when the trial court appointed defense counsel. According to the State, "[d]efense counsel ha[d] advised that there [would] be additional witnesses and statements forthcoming in disclosure"—all of which the State would have to investigate. The State argued that the time since July 16, 2018, should be retroactively attributed to defendant because of defendant's late disclosure to defense counsel regarding any possible defenses. The State requested a judicial determination "that the time since July 16, 2018[,] to the next trial date of September 24, 2018[,] be [a] delay attributable to the defense."

¶ 14    On August 24, 2018, the trial court conducted a hearing on the People's Response at which the prosecutor reiterated the request in her motion. Defense counsel opposed that request and reminded the court that on July 16, 2018, defense counsel (1) announced his readiness for trial and (2) demanded a speedy trial. "We were ready to proceed on that day," he said. Subsequently, he "received new information," which he disclosed to the State as soon as he received it. Defense counsel noted that because "[t]he trial date [was] still approximately one month out," the State had "ample time" to investigate "one witness." Counsel added that "I don't believe at this point it's appropriate to attribute any delay to [defendant], because at this point, I don't know that there is a delay."

¶ 15    After considering these arguments, the trial court decided to split the difference and "attribute the delay from [July 16 to August 21, 2018,] to the State" but to attribute "the delay *** from [August 21 to September 24, 2018,] to the [d]efendant, because of this late disclosure." After so ruling, the court reminded the parties that "the trial date for September 24, 2018, at 9:00 a.m. still stands at this time."

¶ 16    At the next hearing, on September 24, 2018, the trial court inquired regarding the status of the case. Defense counsel answered, "Your Honor, it's actually set for trial today. The speedy trial demand had been tolled. I'm going to be answering ready and demanding speedy [trial] again this morning." Again, however, the State moved to continue, explaining as follows:

- 3 -

"Your Honor, at this time the State is moving to continue. [Defense counsel] and I have had conversations based upon other scheduling that was canceled to try this case the week of November 5th, if possible. It appears we agree that the speedy [trial term] would run November 29th of 2018. I have contacted my experts, they are available that week. And there was additional discovery that [defense counsel] had tendered to me, I have tendered supplementals to [defense counsel] and indicated to him the circumstances around my cellular phone record expert."

¶ 17     The trial court ruled as follows:

"So State motion to continue over the objection of the Defendant, who announces ready for trial pursuant to the Speedy Trial Statute. The delay would be attributable to the State. *** [W]e are going to set it for trial actually November 6, 2018, at 9:00 AM."

¶ 18                              B. The Pretrial Motions Pertaining to Evidence

¶ 19     In November 2018, the trial court conducted a hearing at which it heard the parties' pretrial motions. The State moved *in limine* to impeach defendant, if he testified, with a 2013 unlawful possession of a weapon by a felon conviction, a 2013 mob action conviction, and a 2010 burglary conviction. The court denied the State's motion as to the possession of a weapon by a felon conviction but granted it as to the others.

¶ 20     The State also moved *in limine* to introduce, as a dying declaration and excited utterance, Williams's statement that defendant shot him, and the trial court granted that motion.

¶ 21     Defendant moved *in limine* that he be allowed to introduce at trial a rap video made by defendant's cousin, Albert Gardner, which defendant argued was a third-party confession to the shooting of Williams. In the video, Gardner raps, "N*** shot up Granny house. Had to hunt him down. He gone. Where he at? Body resting in the f*** ground. He gone."

¶ 22     In support of this motion, defendant noted that Naomi Cross was the grandmother of both Gardner and defendant. Defendant further argued that (1) defendant's sister, Latifa Cross, was killed when people shot up Naomi's house and (2) of the two men who pleaded guilty to Latifa's murder, Williams was now dead while the other man remained alive. Defendant asserted he would present evidence that on the very morning of the shooting, Gardner borrowed from defendant the car linked to Williams's shooting.

¶ 23     Defendant acknowledged that Gardner could not testify himself because he was later shot and killed in June 2018, but counsel argued that other relevant factors suggested Gardner's confession was trustworthy. The court denied defendant's motion, concluding that sufficient indicia of trustworthiness did not exist.

¶ 24                                          C. The Jury Trial

¶ 25     Later in November 2018, the trial court conducted defendant's jury trial.

¶ 26                                      1. *The State's Evidence*

¶ 27     Julie Groppi testified that she was a bus driver for Danville Mass Transit on July 7, 2017. Just before 1 p.m. that date, while driving her route, she saw a shooting, and it was captured on the cameras mounted on her bus. Groppi testified that she saw a car and a man on a bike approaching her bus on her side of the road instead of the side they were supposed to be on. (We note that other witnesses would later identify the man on the bike as Williams. For clarity,

we will refer to him as Williams, even though Groppi never identified him as Williams.) She testified that Williams was "trying to go [a] really pretty good speed, you know. It looked like he was trying to get away from that car." The car came up to the bike, at which point Williams wobbled on the bike and then fell into a ditch. Groppi thought the car might have hit him and stopped her bus to ask if he was alright. Williams asked her to call an ambulance, but Groppi explained she had already called dispatch for an ambulance and police. Another man walked up, and Groppi requested that he stay with Williams because she needed to continue with her route. During Groppi's conversation with Williams, he never told her that he had been shot.

¶ 28    Groppi identified a DVD that showed the camera views from the front of her bus and its front door. The State played the first video, which showed the car come up to the bike and Williams fall into the ditch. We note that the car was later identified as a blue, four-door, 2008 Chevrolet Impala owned by Latina Jones, defendant's former girlfriend. The State played the second video, which showed the interaction when Groppi pulled up to speak with Williams.

¶ 29    Antez Baxytum testified that on July 7, 2017, she was 13 years old and was walking down the street when she heard what she thought were firecrackers. Baxytum turned and saw a man fall off a bike into a ditch. A car sped away, and Baxytum did not see more than one person in the car. Baxytum could not remember if the driver was a man or a woman. Baxytum acknowledged that she told a detective a few days after the incident that (1) a black man was driving the car and (2) she estimated two or three other black men were in the car.

¶ 30    Kelia Howard testified that on July 7, 2017, at around 1 p.m., she was driving on the street in question when she saw a man fall off his bike into a ditch. She stopped to help and called 911 because he appeared injured. She described the man, who was Williams, as angry and hot-tempered. She identified a recording of her 911 call, and the State played it for the jury. In the recording, Howard could be heard stating that Williams told her he had been shot in the stomach and leg and that the shooter was defendant.

¶ 31    Josh Long testified that he was an officer with the Danville Police Department and he was the first officer to respond to the scene. When he observed Williams, he saw a lot of blood near Williams's right hip. Long testified that Williams asked for an ambulance several times, told Long that defendant shot him, and told Long that defendant was the only person in the car. An ambulance arrived about two minutes later and took Williams to the hospital. No other police officer had a chance to speak with Williams before he died.

¶ 32    Cliff Hegg testified that he was an officer and evidence technician with the Danville Police Department and he collected evidence from the scene. Hegg testified that he collected a Red Bull energy drink can that looked as if it had been freshly discarded. Hegg further testified that he, along with other officers, thoroughly searched for shell casings but never found any. However, Hegg explained that while some firearms, such as semi-automatic pistols, eject shell casings, other firearms, such as revolvers, do not.

¶ 33    The parties then stipulated that an expert would testify that (1) the deoxyribonucleic acid (DNA) in the blood collected from the scene matched Williams and (2) the DNA found on the Red Bull can that Hegg collected did not match Williams or defendant.

¶ 34    Latina Jones testified that she was defendant's former girlfriend and was dating him at the time of the shooting. Defendant spent the night before the shooting at her residence. Jones testified that on the day of the shooting, she gave defendant permission to take her cell phone and her car—a blue, four-door, 2008 Chevrolet Impala. Jones stated she was asleep when defendant left, but estimated that he may have left between 10 and 11 a.m.

¶ 35        Jones further testified that on July 7, 2017, the police came to her house "maybe about 12:00, 1:00, maybe," and then later that day around 5:30 p.m. to look for defendant. Jones told the police that she had not spoken with defendant. After the police left the first time, she unsuccessfully tried to contact defendant.

¶ 36        Jones also testified that Gardner was at her house at 5:30 p.m. during the second police visit. After the police left that second time, Gardner gave Jones directions to where her car was parked, and Gardner's girlfriend went with Jones to pick it up. Jones testified that when she got to her car, "Somebody gave [the car keys] to me, walked up and gave them to me." Neither party asked Jones to clarify who this person was. Jones then drove to her sister's house in Champaign.

¶ 37        Jones additionally testified that, later that night, she spoke with defendant and he asked her to come get him in Chicago. The following day, Jones picked up defendant from Chicago and drove him to her sister's residence in Country Club Hills, Illinois, a Chicago suburb. Jones testified that during the drive, they did not talk other than to discuss why Jones did not give the police her car. Jones testified that she knew the police wanted her to call them if she heard from defendant, but she did not call them. Jones testified that on the morning of July 9, 2017, the police came to her sister's home and arrested defendant. Later that day, Jones showed police officers where she had parked her car.

¶ 38        Jones acknowledged that she had previously pleaded guilty to obstruction of justice for her actions in this case and received probation in exchange for her agreement to cooperate and testify against defendant.

¶ 39        Thomas Davis testified that he was a detective with the Danville Police Department and went to Country Club Hills on July 9, 2017. Davis saw Jones's car in Jones's sister's garage. Davis testified that it appeared that a portion of the driver's side roof was cleaner than the rest of the car.

¶ 40        Tim Lemasters testified that he was a crime scene investigator with the Illinois State Police and he photographed and processed Jones's car for gunshot residue and fingerprints. Lemasters testified that there was a "void" in the dust on top of the car above the driver's door but he could not say who or what caused it. Lemasters's examination revealed possible gunshot residue from the interior and exterior of the driver's side door, and he took samples from those areas. Lemasters also recovered two rags from the front passenger door console that he suspected might have been used to wipe down the car. Lemasters took 16 different fingerprint lifts from the car, focusing on the driver's area.

¶ 41        Ellen Chapman testified that she worked for the Illinois State Police Forensic Science Center in Chicago and explained her expertise in trace evidence analysis and gunshot residue testing. Chapman tested the shorts, shoes, rags, and kit used by Lemasters to take samples from the car. All of her tests were negative for gunshot residue. She explained that a negative result meant that there was no residue on any of the items when she did her tests, but she did not know if residue had been present and removed prior to the tests.

¶ 42        The parties stipulated that, if called to testify, Katharine Mayland would testify as to her expertise in fingerprint analysis and would opine that only eight of the fingerprint lifts collected were good for comparison to defendant and Gardner. She identified three of the fingerprints taken from the interior of the driver's side door as coming from defendant. She concluded that three of the fingerprints from the driver's side door area came from neither defendant nor Gardner. Finally, her analysis of two fingerprints, taken from the interior side of a screen

protector of a cell phone case located in the car, was inconclusive as belonging to either defendant or Gardner.

¶ 43     Shiping Bao testified that he was a medical doctor and forensic medical examiner, and he determined that Williams had two gunshot wounds as well as a minor graze wound. One bullet lodged in the muscles of Williams's right hip and caused a nonfatal injury. The other bullet was recovered from under the skin of Williams's left lateral abdomen and caused the fatal wound. Bao testified that the bullet traveled "from the right to left upwards, back to front, [and] went through the entire liver."

¶ 44     The parties further stipulated that, if called to testify, Carolyn Kersting would testify that she was an expert in the field of firearms analysis and that the two bullets were .380 caliber and fired from the same firearm.

¶ 45                              2. *The Defendant's Evidence*

¶ 46     Naomi Cross testified that she was defendant's grandmother, and on July 7, 2017, defendant came to her house in his girlfriend's car at around 8:30 or 9 a.m. to see his daughter, who was staying with Naomi for the summer. Gardner had spent the night at her house and left in the car defendant arrived in around 9:30 or 10 a.m. to take Gardner's friend to court. Gardner did not return that day, and she did not see the car again. Defendant was at her house at 1 p.m., along with several other people and left around 2:30 or 3 p.m.

¶ 47     Naomi testified that after she heard defendant was arrested, she went to the police station in an attempt to speak with someone. The person she spoke to did not want to hear what she had to say, so she left.

¶ 48     The police did not contact her from July 2017 until sometime in September 2018. No one contacted her about the case until an investigator for the defense spoke with her in August 2018. Naomi testified that she chose not to speak with the police detective who came to speak with her in September 2018 because she had tried to speak with the police earlier and they were not interested in what she had to say.

¶ 49     Defendant testified that he had known Williams since 2004. Defendant knew Williams had pleaded guilty to killing Latifah Cross, defendant's sister, in 2013, but denied knowing Williams was out of prison. Defendant acknowledged that he had been convicted of burglary in 2010 and mob action in 2013.

¶ 50     Defendant testified that on July 7, 2017, he left Jones's house in the morning with her car and phone. Defendant had Jones's phone because his phone's battery had lost its charge and Jones had let him borrow hers. Defendant drove to his grandmother's house and let Gardner borrow the car to take a friend of his to court. Defendant also let Gardner borrow Jones's phone because Gardner was taking a woman out after his errand.

¶ 51     Defendant added that Gardner left in Jones's car around 10 a.m. Defendant stayed at his grandmother's house until a man named Tyrell arrived around 2 p.m. Tyrell told defendant that the police were looking for him, so he joined Tyrell as they drove around in Tyrell's car looking for Jones's car and Gardner. They found neither the car nor Gardner, so they went to Tyrell's house so he could get ready to go to a casino in Chicago.

¶ 52     Defendant testified that a short time later, Gardner knocked on Tyrell's door, and defendant had a heated discussion with him. Gardner returned Jones's phone to defendant and left.

Defendant went to Chicago with Tyrell. Later, Jones picked defendant up, and they went to her sister's house where he was arrested on July 9, 2017.

¶ 53 On cross-examination, the State asked, "[W]hen you found out that the police were looking for you, you didn't go to the police station and tell them I have been at my grandma's house all afternoon, all day?" Defendant responded, "No." The State continued, "You didn't call the police and tell them anything about *** Albert Gardner, right?" Defendant again responded, "No." Defendant also acknowledged that Gardner was killed on June 15, 2018.

¶ 54 ### 3. *The State's Rebuttal Evidence*

¶ 55 Detective Davis testified that, to his knowledge, Naomi never came to the police station to speak with him or any other officer. He further testified that Naomi was uncooperative when he attempted to speak with her on September 7, 2018.

¶ 56 ### 4. *The Jury's Verdict*

¶ 57 Following closing arguments, the jury returned a verdict of guilty as to first degree murder but not guilty as to the firearm enhancement.

¶ 58 ## D. Sentencing

¶ 59 In January 2019, the trial court conducted defendant's sentencing hearing. The State called Patrick Carley, a detective whom the parties stipulated was an expert in gangs. He testified that the Rude Boy Gang and the 450 Gang were rival gangs in Danville. Carley added that an increase in violence between the two gangs began in 2013 and the murder of Latifah Cross in May 2013 was a part of that violence. Carley further testified that Ollie Williams and Kevin Marshall were members of the Hot Boy Gang, a precursor to the 450 Gang, when they pleaded guilty to murdering Latifah.

¶ 60 Carley also testified that State exhibits showed defendant making hand signs associated with the Rude Boy Gang. Carley then identified an exhibit that was a screenshot from the Facebook profile of Antwanne Hall, showing emojis that referenced the shooting of Williams. The post was made the same day that Williams was killed. However, Hall was in prison at the time of the post, and Carley did not know who made the Facebook post. Carley further described other screenshots and a video that formed the basis of his opinion that defendant was a member of the Rude Boy Gang.

¶ 61 The State recommended 60 years in prison for defendant because (1) he had been committing crimes since he was 15 years old, (2) he shot at Williams when others were around, (3) he and Jones befriended Williams's mother for the sole purpose of obtaining information about Williams, (4) the "cycle of violence needs to stop," and (5) a strong message of deterrence had to be sent.

¶ 62 Defendant recommended a sentence of 20 years in prison, arguing (1) no evidence had been submitted to the jury that the shooting was gang related, (2) no evidence was presented that Williams was in a gang upon his release from prison in 2017, and (3) the insinuation that defendant and Jones befriended Williams's mother to get information about Williams was contradicted by Jones's testimony that she knew Williams's mother for years before the shooting. Defendant further argued that he had earned his GED, took some college courses in prison, and had a relationship with his daughter.

¶ 63    Prior to sentencing defendant, the trial court stated the following:

"Okay. Well, I've watched in the courtroom this morning and actually throughout the entire time, and you somehow think this is funny. You've been smiling, you've been smirking the whole time even while watching the video, even during the course of the trial. You have shown absolutely no remorse at all for what you did. You think it's funny. It's not funny. It's despicable. It's inexcusable, and I agree with [the State] that what is going on in this community, the back and forth, the hatred, the gun violence has got to stop, and I'm going to make an example out of anyone that comes in front of me under similar circumstances that I'm not [going to] tolerate this behavior.

* * *

*** I don't find any factors in mitigation that apply to this case.

When I look at the factors in aggravation[,] I find that your conduct caused or threatened serious harm. Obviously this person died. Mr. Williams died. You have a history of prior delinquency or criminal activity, and most importantly the sentence is necessary to deter others from committing the same crime. And I would show—note for the record that [defendant] continues to smile and smirk."

¶ 64    The trial court sentenced defendant to 59 years in prison.

¶ 65    This appeal followed.

¶ 66                                    II. ANALYSIS

¶ 67    Defendant appeals, arguing the trial court erred because (1) defendant was not tried within 120 days of his arrest, in violation of his statutory right to a speedy trial, (2) defendant's conviction for first degree murder was not proven beyond a reasonable doubt, (3) defendant was denied his constitutional right to present a defense when the trial court prevented him from presenting evidence that Gardner made a video in which Gardner took credit for shooting Williams, and (4) at sentencing, the court improperly relied on aggravating factors unsupported by evidence and ignored factors in mitigation.

¶ 68    We disagree and affirm.

¶ 69                           A. The Statutory Speedy-Trial Claim

¶ 70    First, defendant argues that his statutory speedy-trial rights were violated because he was not tried within 120 days of his arrest. Specifically, defendant contends that (1) 131 of defendant's days spent in pretrial custody should have been attributed to the State, (2) the trial court abused its discretion when it attributed 34 of those 131 days to defendant, and (3) defense counsel was ineffective because he failed at any point in the trial court to file a motion to discharge based upon a speedy-trial violation.

¶ 71    We conclude that (1) the trial court did not abuse its discretion and (2) defendant received effective assistance of counsel.

¶ 72                             1. *The Speedy-Trial Statute*

¶ 73    Under section 103-5(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-5(a) (West 2016)) (hereinafter the "speedy-trial statute"), a defendant who is in custody must be tried within 120 days after arrest, excluding certain enumerated delays:

"(a) Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant, by an examination for fitness ordered pursuant to Section 104-13 of this Act [(725 ILCS 5/104-13)], by a fitness hearing, by an adjudication of unfitness to stand trial, by a continuance allowed pursuant to Section 114-4 of this Act [(*id.* § 114-4)] after a court's determination of the defendant's physical incapacity for trial, or by an interlocutory appeal. Delay shall be considered to be agreed to by the defendant unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record. The provisions of this subsection (a) do not apply to a person on bail or recognizance for an offense but who is in custody for a violation of his or her parole, aftercare release, or mandatory supervised release for another offense.

The 120-day term must be one continuous period of incarceration. In computing the 120-day term, separate periods of incarceration may not be combined. If a defendant is taken into custody a second (or subsequent) time for the same offense, the term will begin again at day zero."

¶ 74   In tallying up the days of the speedy-trial term, courts exclude the first day but include the last day unless it is a Sunday or a holiday. See 5 ILCS 70/1.11 (West 2016); *People v. Shaw*, 24 Ill. 2d 219, 222, 181 N.E.2d 120, 121-22 (1962). Further, courts are also to exclude from that tally any of the delays described in section 103-5(a), including, most notably, delays "occasioned by the defendant" and delays to which he agreed.

¶ 75                    2. *The Trial Court's Discretion to Attribute Delays in the Speedy-Trial*
¶ 76                                    *Term to the Parties*

¶ 77   " 'The trial court's determination as to who is responsible for a delay of the [speedy-trial term] is entitled to much deference, and should be sustained absent a clear showing that the trial court abused its discretion.' " *People v. Pettis*, 2017 IL App (4th) 151006, ¶ 17, 83 N.E.3d 422 (quoting *People v. Kliner*, 185 Ill. 2d 81, 115, 705 N.E.2d 850, 869 (1998)). "A trial court abuses its discretion when its ruling is arbitrary 'or when no reasonable person would take the view adopted by the trial court.' " *People v. Pope*, 2020 IL App (4th) 180773, ¶ 28, 157 N.E.3d 1055 (quoting *People v. Bates*, 2018 IL App (4th) 160255, ¶ 60, 112 N.E.3d 657).

¶ 78                                    3. *Defining Terms*

¶ 79   Some confusion has arisen from the use of imprecise terminology when addressing speedy-trial issues. For instance, the final day of the speedy-trial term is sometimes called (1) the discharge date, (2) the final day of the speedy-trial term, or (3) something else entirely. Clearly defined terms are important for our analysis because one of the central questions in this case—indeed, in many if not most speedy-trial cases—is what it means to have a "delay *** occasioned by the defendant." 725 ILCS 5/103-5(a) (West 2016). We conclude that in the interest of clarity, parties and courts ought to use the terminology employed by the Illinois Supreme Court.

¶ 80   First, the Illinois Supreme Court has described the "120-days" referred to in the speedy-trial statute as "the speedy-trial term." *People v. Sandoval*, 236 Ill. 2d 57, 69, 923 N.E.2d 292,

299 (2010). We adopt this terminology and deem it appropriate for use by courts and parties because it clearly and unambiguously identifies the period at issue.

¶ 81        Second, "discharge date" is the term that best describes the final day of the speedy-trial term. While "the final day of the speedy-trial term" is the most descriptive, we recognize that it is simply too lengthy a phrase to readily employ in busy trial courts. Using the term "discharge date" conveys the appropriate information—on that date the defendant must be tried or else he or she "must be discharged from custody, and the charges must be dismissed." *Kliner*, 185 Ill. 2d at 114-15.

¶ 82        Third, "delay" is clearly the appropriate term for any action that slows down the criminal justice process and often—directly or indirectly—delays trial or the mere possibility of a trial. As we later explain, "delay" is used very broadly by Illinois courts, and any action that "eliminates the possibility that [a] case could be immediately set for trial" counts as delay. *People v. McDonald*, 168 Ill. 2d 420, 440, 660 N.E.2d 832, 840 (1995), *abrogated on other grounds by People v. Clemons*, 2012 IL 107821, 968 N.E.2d 1046. In the context of analyzing a particular defendant's speedy-trial term and determining his discharge date, a "delay"—or, more precisely, a "delay attributable to the defendant"—means a delay of the speedy-trial term, with the effect of moving back that defendant's discharge date. "Delay" does *not* mean a delay of defendant's trial or trial date, as we explain in greater detail below (*infra* ¶¶ 84-88).

¶ 83        Fourth, "tolling" is a well-recognized term that is employed in various contexts throughout the law, and it accurately captures what happens when a defendant causes a delay, thereby moving back the discharge date. See, *e.g.*, *United States v. Kwai Fun Wong*, 575 U.S. 402, 407 (2015); *McDonald*, 168 Ill. 2d at 438-39 ("Any period of delay found to be occasioned by a defendant tolls the 120-day period under the speedy-trial statute."). Tolling refers to (1) suspending or stopping the running of the statutory speedy-trial term and then (2) having that term begin to run again (with a later discharge date) once whatever the action was that caused the tolling has been concluded. See *People v. Cordell*, 223 Ill. 2d 380, 391, 860 N.E.2d 323, 330 (2006).

¶ 84                    4. *The Trial Date Need Not Be Moved for a "Delay"*
                              *to Be Attributable to a Defendant*

¶ 85        The Illinois Supreme Court has, on numerous occasions in the past 60 years, determined that a delay was attributable to a defendant without considering the actual movement of the trial date as a factor. See, *e.g.*, *id.* at 390 ("There is nothing in the section [103-5(a)] to indicate that the 'delay' must be of a set trial date. *** To hold otherwise would contravene the purpose of the 120-day period of the section ***."). For example, in *People v. Grant*, the Illinois Supreme Court noted the trial date in its discussion of the background in that case, but wrote that defendant's motion to sever was *per se* attributable to the defendant without mentioning anything about moving the trial date. *People v. Grant*, 68 Ill. 2d 1, 5, 368 N.E.2d 909, 911 (1977) ("[G]ranting of a motion to sever *per se* tolls the 120-day provision of the 'speedy trial' statute."). In *People v. Donalson*, 64 Ill. 2d 536, 542, 356 N.E.2d 776, 778 (1976), the Illinois Supreme Court held that the delay caused by the defendant's motion to suppress evidence was attributable to defendant, and in so holding, the supreme court did not mention at all any movement of the trial date in that case. Instead, the court concluded, "The mere filing of the motion eliminated the possibility that the case could be immediately set for trial. We therefore

hold that the filing of the motion to suppress the confession was a delay occasioned by the defendant which tolled the running of the 120-day statutory period." *Id.*

¶ 86 Other Illinois Supreme Court cases have similar holdings. See *People v. Jones*, 104 Ill. 2d 268, 277, 472 N.E.2d 455, 459 (1984) (holding, without mentioning any movement of the trial date, that "the delay between the filing of the motion to dismiss and quash the indictment on May 21, 1981, *** and the date that the oral ruling on these motions was made by the court on July 24, 1981, is chargeable to the defendant"); *People v. Rankins*, 18 Ill. 2d 260, 263, 163 N.E.2d 814, 816 (1960) ("However, by procuring a change of venue on May 14, 1957, defendant occasioned a further delay which again interrupted the running of the four-months term and extended its termination until September, 1957."); *McDonald*, 168 Ill. 2d at 440 ("Regardless of the disposition of a motion, it has been held that the mere filing of a motion eliminates the possibility that the case could be immediately set for trial. [Citation.] Consequently, any delay resulting from this defendant's filing of his motion is attributable to him.").

¶ 87 The Illinois Appellate Court has also determined that a delay is attributable to a defendant without considering as a factor the actual movement of the trial date. See *People v. Tucker-El*, 123 Ill. App. 3d 955, 960, 463 N.E.2d 991, 996 (1984) ("The time required to hear and decide a motion for change of venue is delay attributable to the defendant [citation], and the trial court so advised him."); *People v. Lilly*, 2016 IL App (3d) 140286, ¶ 40, 53 N.E.3d 1028 ("[A]ny type of motion filed by defendant which eliminates the possibility that the case could immediately be set for a trial also constitutes an affirmative act of delay attributable to defendant."); *People v. Lendabarker*, 215 Ill. App. 3d 540, 553-54, 575 N.E.2d 568, 576-77 (1991) (disagreeing with defendant's argument that "the motion for substitution of judges did not *in fact* lead to a delay chargeable to him" and instead concluding that "the filing of the motion and the petition made it impossible to set the case for trial before resolving the motions" (emphasis in original)).

¶ 88 This court has often determined that a delay was attributable to a defendant without considering actual movement of the trial date. Recently, in *People v. Hartfield*, 2020 IL App (4th) 170787, ¶¶ 39-46, this court determined that a delay was attributable to the defendant and ultimately concluded that,

> "under the plain language of section 103-5(a), an objection to a proposed delay, without a demand for trial, operates as an agreement to the delay—period: no exceptions, no limitations, no qualifications. *** It follows that defendant is considered to have agreed to the first continuance and he has no valid statutory speedy-trial claim." *Id.* ¶ 45.

In other words, in *Hartfield*, this court determined that the delay was attributable to defendant because his actions amounted to agreement to a delay, and movement of the trial date was not a factor in our determination.

¶ 89 In *People v. Phillips*, 2017 IL App (4th) 160557, ¶¶ 68-69, 92 N.E.3d 544, and *Pettis*, 2017 IL App (4th) 151006, ¶¶ 26-30, we likewise determined, without discussing any actual movement of the trial date, that the trial court appropriately attributed a delay to the defendant.

¶ 90 5. *The Law Regarding Ineffective Assistance of Counsel*

¶ 91 All defendants enjoy the constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. "To prevail on a claim of ineffective assistance

of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *Pope*, 2020 IL App (4th) 180773, ¶ 61.

¶ 92   "To establish deficient performance, a defendant must show his counsel's performance fell below an objective standard of reasonableness." *People v. Williams*, 2020 IL App (4th) 180554, ¶ 80, 167 N.E.3d 233. It is not sufficient for a defendant to show that counsel's representation was imperfect because the constitution guarantees only a reasonably competent counsel. *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Instead, a defendant must show his counsel's representation undermined the proper functioning of the adversarial process to such an extent that the defendant was denied a fair trial. *Id.* (citing *Strickland*, 466 U.S. at 686).

¶ 93   To show prejudice, a defendant must demonstrate "that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601.

¶ 94   "Counsel's failure to assert a speedy-trial violation cannot establish either prong of an ineffective assistance claim if there is no lawful basis for raising a speedy-trial objection." *People v. Phipps*, 238 Ill. 2d 54, 65, 933 N.E.2d 1186, 1192 (2010).

¶ 95                                                    6. *This Case*

¶ 96   The parties do not dispute the trial court's attribution of the vast majority of delays in this case. Their only dispute is over the trial court's decision regarding 34 of the days—that is, the days between defendant's late disclosure of an alibi witness on August 21, 2018, and the next court hearing on September 24, 2018.

¶ 97   As an initial matter, defendant argues that "the State's request to retroactively attribute" the 34 days to defendant was improper. We note that only a small portion of the days in question so attributed to defendant would qualify as "retroactive." The trial court made its decision on August 24, 2018, attributing the days between August 21, 2018, and September 24, 2018, to defendant instead of the State. Only the days between August 21 and 24 could be considered "retroactive."

¶ 98   Of course, even if we were to agree with defendant that the court's retroactive assignment of those four days was improper, it would make no difference. The remaining days would still "make or break" defendant's claim. If the remaining days were properly attributable to defendant, his speedy-trial claim fails. On the other hand, if the trial court abused its discretion by attributing those days to defendant, then defendant prevails on his claim that he was not tried within the speedy-trial term. Because the days between August 21 and 24 do not make a difference in this case, we need not discuss them further.

¶ 99   Defendant argues that the trial court's reassignment of the days between August 24, 2018, and September 24, 2018, was an abuse of discretion. The court erred, in defendant's view, because his late disclosure of Naomi Cross as an alibi witness did not delay the jury trial. We conclude that the trial court did not abuse its discretion by so ruling. In so concluding, we reiterate what we wrote earlier: " 'The trial court's determination as to who is responsible for

a delay of the [speedy-trial term] is entitled to much deference, and should be sustained absent a clear showing that the trial court abused its discretion.' " *Pettis*, 2017 IL App (4th) 151006, ¶ 17 (quoting *Kliner*, 185 Ill. 2d at 115); see *supra* ¶ 77. Given the totality of the circumstances before the trial court when it made its decision to reassign the days in question to defendant, thereby tolling the running of the speedy-trial term and moving back defendant's discharge date, the court's decision to do so was not an abuse of its direction.

¶ 100    We note that some support for this conclusion may be found in Illinois Supreme Court Rule 415(g)(i) (eff. Oct. 1, 1971), which deals with discovery violations. When, in the trial court's judgment, a defendant has violated that obligation, the court could "order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances." *Id.* That final catchall phrase—"enter such other order as it deems just under the circumstances" (*id.*)—may provide some authority for the trial court in this case to attribute the days in question to defendant as a penalty for noncompliance with Illinois Supreme Court Rule 413(d)(i) (eff. July 1, 1982). See also *People v. Murphy*, 47 Ill. App. 3d 278, 283, 361 N.E.2d 842, 846 (1977) ("The defendant's failure to comply with the trial court's discovery order *** constituted delay attributable to defendant."), *aff'd*, 72 Ill. 2d 421, 381 N.E.2d 677 (1978).

¶ 101    Thus, for the reasons we stated earlier, trial counsel could not have been ineffective for failing to move to dismiss because defendant was not prejudiced by defense counsel's actions related to the speedy-trial statute issue. In other words, had defense counsel so moved, the trial court's denial of that motion would have been correct.

¶ 102    In addition, although our decision does not turn on this issue, we recognize that limited guidance existed for defense counsel when he was determining how to proceed regarding the speedy-trial issue. For us to conclude that defense counsel performed deficiently, defendant must make a showing that defense counsel's action or inaction fell below an *objective* standard of reasonableness. *People v. Evans*, 209 Ill. 2d 194, 219-20, 808 N.E.2d 939, 953 (2004). Here, few objective standards existed that defense counsel could use to guide his actions. Insofar as they did exist, like Illinois Supreme Court Rule 413(d)(i) (eff. July 1, 1982), that authority tended to cut against a dismissal based upon an alleged speedy-trial violation rather than support it. We are reluctant to deem a defense attorney's actions deficient when they have not violated a clear standard.

¶ 103                                    7. *People v. Boyd*

¶ 104    We note that defendant heavily relies upon a case from the Second District, *People v. Boyd*, 363 Ill. App. 3d 1027, 1037, 845 N.E.2d 921, 930 (2006), in which that court held, "Thus, unless the trial date is postponed, there is no delay to attribute to defendant." With all due respect to our sister district, this statement of the law is incorrect, overbroad, and misreads the authority upon which it purports to rest. Because this area of the law is so important and trial courts need clear direction, we explain how *Boyd* goes awry.

¶ 105    The *Boyd* court cites *People v. Hall*, 194 Ill. 2d 305, 326, 743 N.E.2d 521, 534 (2000), as support for its holding. In *Hall*, the Illinois Supreme Court wrote the following: "A delay is 'occasioned by the defendant' when the defendant's acts caused or contributed to a delay resulting in the postponement of trial." *Id.* at 326-27. However, a comparison of these words with the words used by the Second District in *Boyd* reveals a subtle but significant difference. In *Hall*, the Illinois Supreme Court decided that an action by a defendant that causes an actual

- 14 -

delay of trial is *sufficient* for the court to determine that the delay in the speedy-trial term is attributable to the defendant. However, the Illinois Supreme Court did not say that a delay is occasioned by the defendant *only if* the defendant's acts caused or contributed to a delay resulting in the postponement of trial—such a statement would make the condition *necessary* rather than merely *sufficient*. However, the *Boyd* court committed precisely that error, concluding that a delay is attributable to the defendant *only if* the trial date is postponed. See generally Norman Swartz, *The Concepts of Necessary Conditions and Sufficient Conditions*, Simon Fraser Univ., https://www.sfu.ca/~swartz/conditions1.htm (last visited Oct. 14, 2021) [https://perma.cc/33PT-LGCJ].

¶ 106    The remaining cases that *Boyd* cites similarly do not support its conclusion for the same reason. See *Kliner*, 185 Ill. 2d at 114 ("A delay is occasioned by the defendant and charged to the defendant when the defendant's acts caused or contributed to a delay resulting in the postponement of trial."); *McDonald*, 168 Ill. 2d at 438 ("A delay is held to be occasioned by a defendant when a defendant's acts caused or contributed to a delay resulting in the postponement of trial."), *abrogated on other grounds by Clemons*, 2012 IL 107821; *People v. Turner*, 128 Ill. 2d 540, 550, 539 N.E.2d 1196, 1199 (1989) ("In determining whether delay is occasioned by the defendant, the criterion is whether his acts in fact caused or contributed to the delay."); *People v. Reimolds*, 92 Ill. 2d 101, 106, 440 N.E.2d 872, 875 (1982) ("A delay is held to be occasioned by the defendant when the defendant's act in fact caused or contributed to the delay."). Read together, these cases form an unbreaking precedent from the Illinois Supreme Court that a defendant's acts that cause or contribute to a postponement of trial are *sufficient* for finding that a delay in the speedy-trial term is occasioned by defendant. However, none of these cases—and no other cases that we could find—stand for the proposition that a postponement of trial is *necessary* before a defendant can be deemed to have caused a delay under the statute.

¶ 107    Instead, defendant's assertion that the speedy-trial clock is tolled *only if* the trial date is in fact moved is contrary to longstanding Illinois Supreme Court case law. That court, when analyzing the speedy-trial statute, has written the following:

> "*There is nothing in the section to indicate that the 'delay' must be of a set trial date.* Rather, the section provides only a starting point—the date custody begins, and an ending point—120 days later. Any action by either party or the trial court that moves the trial date outside of that 120-day window qualifies as a delay for purposes of the section. To hold otherwise would contravene the purpose of the 120-day period of the section, which is to guarantee a speedy trial and not to open a new procedural loophole which defense counsel could unconscionably use to obstruct the ends of justice." (Emphasis added and internal quotation marks omitted.) *Cordell*, 223 Ill. 2d at 390.

In other words, defendant's contention—and the Second District's decision in *Boyd*—is directly contradicted by the Illinois Supreme Court. (To be fair to the Second District, we note that *Boyd* was decided before the Illinois Supreme Court issued its decision in *Cordell*.)

¶ 108    Last, the notion that a delay could only be attributable to a defendant if a set trial date was in fact moved contradicts the Illinois Supreme Court's decisions regarding defendant's actions that *per se* toll the 120-day statutory speedy-trial period. In *Grant*, 68 Ill. 2d at 1, 5-6, the Illinois Supreme Court said, "We believe that there is a sound basis for the holdings of the later cases that the granting of a motion to sever *per se* tolls the 120-day provision of the 'speedy trial' statute." In that same case, the court said, "We have also held that motions for substitution

of judges *per se* toll the 120-day period of the speedy trial statute." *Id.* at 6. If defendant were correct that the trial court would have needed to move the trial date for a delay to be attributable to defendant, such a *per se* holding would be impossible.

¶ 109   Because *Boyd* is predicated on a misreading of Illinois Supreme Court cases, we decline to follow it.

¶ 110                    B. The State Proved Defendant Guilty of First Degree Murder
                                        Beyond a Reasonable Doubt

¶ 111   Defendant next argues that the State did not prove him guilty of first degree murder beyond a reasonable doubt because the only person who identified defendant as the shooter "made an unreliable identification and had a motive to lie and/or merely assume that [defendant] shot him." We disagree.

¶ 112                                     1. *The Law*

¶ 113   The State bears the burden of proving each element of an offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876. When a defendant challenges his conviction, arguing that the evidence was not sufficient to prove him guilty, a reviewing court (1) considers all of the evidence in the light most favorable to the State and (2) determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Swenson*, 2020 IL 124688, ¶ 35.

¶ 114   "It remains the firm holding of this court that the testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228, 920 N.E.2d 233, 242 (2009). "It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *People v. Bradford*, 2016 IL 118674, ¶ 12, 50 N.E.3d 1112. "[A] court of review will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses." *Gray*, 2017 IL 120958, ¶ 35.

¶ 115   A reviewing court will not reverse a defendant's conviction "simply because there is contradictory evidence or because the defendant claims a witness was not credible." *People v. Mendez*, 2013 IL App (4th) 110107, ¶ 17, 985 N.E.2d 1047. "Instead, a reviewing court will reverse a defendant's conviction only when the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 56, 126 N.E.3d 703.

¶ 116                                     2. *This Case*

¶ 117   In this case, the State presented sufficient evidence for the jury to conclude that the State had proved defendant guilty beyond a reasonable doubt. We need not reiterate all of the evidence that was presented at trial but instead focus on some of the most significant evidence.

¶ 118   This case comes down to the credibility of crucial witnesses. The jury clearly believed Williams's statement, heard second-hand through Howard and Officer Long, that defendant was the shooter. Williams's statement was bolstered by the fact that, on the morning of the shooting, defendant borrowed the vehicle that was indisputably used in the shooting.

¶ 119    We also note that the bus driver, Groppi, testified that Williams was "trying to go [at a] really pretty good speed, you know. It looked like he was trying to get away from that car." This observation contributes to the inference that Williams knew who his attacker was and recognized him before the shooting occurred.

¶ 120    Defendant presented some evidence in his favor—particularly, his grandmother, Naomi, who testified that defendant was at her house at the time of the shooting. However, because she was defendant's grandmother, the jury could have concluded that she had a strong motive to lie to protect her grandson, and the jury clearly did not believe her. Further, the jury obviously rejected defendant's assertion during closing argument that Williams made an unreliable identification.

¶ 121    In this case, the jury chose to believe Williams and to not believe defendant's grandmother, and we will not substitute our judgment for that of the jury. The evidence shows that the jury's decision was entirely justified.

¶ 122             C. The Trial Court Properly Excluded a Video in Which Defendant's
                        Cousin Suggested That He Shot Williams

¶ 123    Next, defendant argues that he was denied his constitutional right to present his defense— that he was not the shooter—because the trial court prevented him from presenting evidence that Gardner made a music video in which he "took credit" for shooting Williams. We need not address the constitutional issue because we conclude that the evidence was properly excluded.

¶ 124    However, we do note that this is yet another case in which, "[s]trangely, instead of asserting that the court made an incorrect evidentiary ruling, defendant attempts to transform that ruling into a constitutional argument related to defendant's right to present a defense." *People v. Woodring*, 2020 IL App (4th) 180158-U, ¶ 54. A defendant is not denied his right to present a defense every time a trial court excludes an arguably favorable piece of evidence, and a defendant cannot transform a routine evidentiary issue into a constitutional claim through linguistic maneuvering. When a defendant does so, as in this case, it adds only clutter to whatever legitimate arguments he may have on appeal.

¶ 125                                    1. *The Law*

¶ 126    "The admission of evidence falls within the sound discretion of the trial court, and we will not reverse the trial court unless that discretion was plainly abused." *People v. Rebollar-Vergara*, 2019 IL App (2d) 140871, ¶ 79, 128 N.E.3d 1059. "A court abuses its discretion only if it acts arbitrarily, without the employment of conscientious judgment, exceeds the bounds of reason and ignores recognized principles of law; or if no reasonable person would take the position adopted by the court." (Internal quotation marks omitted.) *Id.*

¶ 127    " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). Hearsay is not admissible unless it falls within a recognized exception. Ill. R. Evid. 802 (eff. Jan. 1, 2011).

¶ 128    "Generally[,] an extrajudicial declaration not under oath, by the declarant, that he, and not the defendant on trial, committed the crime is inadmissible as hearsay though the declaration is against the declarant's penal interest." *People v. Bowel*, 111 Ill. 2d 58, 66, 488 N.E.2d 995,

- 17 -

999 (1986). However, the Illinois Supreme Court has held that "where there are sufficient indicia of trustworthiness of such extrajudicial statements, a declaration may be admissible under the statement-against-penal-interest exception to the hearsay rule." *Id.* (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).

¶ 129　　"The question to be considered in judging the admissibility of a declaration of this character is whether the declaration was made under circumstances that provide 'considerable assurance' of its reliability by objective indicia of trustworthiness." *Id.* at 67 (quoting *Chambers*, 410 U.S. at 300). Four factors that courts should consider are whether "(1) the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the statement was corroborated by other evidence; (3) the statement was self-incriminating and against the declarant's interest; and (4) there was adequate opportunity for cross-examination of the declarant." *Id.* These four factors "are to be regarded simply as indicia of trustworthiness and not as requirements of admissibility." *Id.*

¶ 130　　　　　　　　　　　　　　　　2. *This Case*

¶ 131　　Defendant does not appear to dispute that the statements contained in the Gardner video are hearsay but argues that (1) the video is admissible as a statement against penal interest and (2) considerable assurance of its reliability existed. We conclude that the trial court properly excluded the Gardner video.

¶ 132　　First, the statements were not made spontaneously to a close acquaintance shortly after the crime occurred. Instead, the statements were made in a music video, which clearly required significant planning and effort. Also, the statements were not made to a close acquaintance or any acquaintance at all; instead, they were made to a wide audience of strangers, indeed, whoever would watch the music video. Nor were the statements made shortly after the crime occurred. Instead, it was made three months after the shooting.

¶ 133　　Second, the statements lacked substantial corroboration. The only corroborating evidence identified by defendant on appeal is that (1) defendant and Naomi testified that Gardner took the vehicle used in the shooting on the morning of the shooting, (2) defendant and Naomi testified that Naomi's house had previously been shot at by Williams, and (3) Jones testified that Gardner was the person who told her where she could find her car after the shooting.

¶ 134　　Part of the reason that this evidence only weakly corroborates Gardner's statements is that those statements are too vague. They lack any details, other than the killing itself, to corroborate.

¶ 135　　Third, the statements were not particularly self-incriminating and against the declarant's interest because they were very vague. The only portion of the statements that could even arguably have implicated Gardner in the murder was "[h]ad to hunt him down." One could infer that he meant "I had to hunt him down," but one could just as easily infer "we had to hunt him down" or "they had to hunt him down." As the State points out, Gardner raps at other moments in the video that "everybody got a gun, everybody shot" and "love my brothers *** be loyal killing for each other." This added context seems to imply that Gardner may not have been referring to himself specifically as the killer but instead could have been "glorifying" the murder of Williams by others, including defendant.

¶ 136　　Fourth, clearly there was no opportunity to cross-examine Gardner because he was killed before trial.

¶ 137    Even if reasonable minds could differ about the second and third factors, we review the trial court's decision to exclude this evidence for an abuse of discretion. We conclude, on this record, that the trial court's decision does not come close to an abuse of its discretion.

¶ 138    Further, even if the second and third factors were present, we could not conclude that the trial court erred by deeming the video insufficiently reliable. As the Illinois Supreme Court has written, "The question to be considered in judging the admissibility of a declaration of this character is whether the declaration was made under circumstances that provide '*considerable assurance*' of its reliability by objective indicia of trustworthiness." (Emphasis added.) *Id.* (quoting *Chambers*, 410 U.S. at 300). On this core question, the statements in the Gardner video fall far short.

¶ 139    Gardner made a music video, something that is commonly understood as an artistic endeavor. Musicians often embellish the details of a story when singing about a personal experience. Hip hop artists in particular frequently use their music to boast about crimes that either they had no part in or are even entirely fictional.

¶ 140    The New Jersey Supreme Court, although examining the admissibility of a defendant's statement instead of a third party's, astutely observed the following:

> "The difficulty in identifying probative value in fictional or other forms of artistic self-expressive endeavors is that one cannot presume that, simply because an author has chosen to write about certain topics, he or she has acted in accordance with those views. One would not presume that Bob Marley, who wrote the well-known song 'I Shot the Sheriff,' actually shot a sheriff, or that Edgar Allan Poe buried a man beneath his floorboards, as depicted in his short story 'The Tell-Tale Heart,' simply because of their respective artistic endeavors on those subjects." *State v. Skinner*, 95 A.3d 236, 251 (N.J. 2014).

¶ 141    We conclude the same principle applies here—namely, the reliability of a statement is diminished when it is created as a part of an artistic endeavor.

¶ 142                    D. The Trial Court Properly Considered the Factors in
                        Aggravation and Mitigation at Sentencing

¶ 143    Last, defendant argues that the trial court at sentencing improperly relied on aggravating factors unsupported by the evidence because the court stated that defendant (1) showed no remorse and (2) acted as a part of a gang. Further, defendant contends that the trial court improperly "ignored the mitigating factors that [defendant's] conduct was based on strong provocation and was the result of circumstances unlikely to recur when imposing a 59-year sentence." We reject these contentions.

¶ 144    First, the trial court is allowed to rely upon a defendant's lack of remorse in sentencing. *People v. Donlow*, 2020 IL App (4th) 170374, ¶ 84 ("However, trial courts may consider a defendant's lack of remorse or lack of veracity in imposing a sentence, since those are factors which may have a bearing on the defendant's potential for rehabilitation." (Internal quotation marks omitted.)).

¶ 145    Second, we need not consider whether a trial court is allowed to consider a defendant's gang affiliation because the trial court—literally—did not mention defendant's gang affiliation at all when describing its reasoning behind the sentence it gave defendant.

¶ 146    Third, nothing in the record suggests that the trial court ignored any factors in mitigation that may have been present. "We presume that the trial court considered the mitigating evidence before it, absent explicit evidence to the contrary." *People v. Johnson*, 2016 IL App (4th) 150004, ¶ 85, 55 N.E.3d 32.

¶ 147                                III. CONCLUSION
¶ 148    For the reasons stated, we affirm the trial court's judgment.

¶ 149    Affirmed.

¶ 150    JUSTICE CAVANAGH, concurring in part and dissenting in part:
¶ 151    While otherwise agreeing with the majority opinion, I respectfully disagree with its analysis of the statutory speedy-trial issue. In finding no statutory speedy-trial violation and, hence, no ineffective assistance, the majority reasons as follows. A defendant can engage in delaying conduct within the meaning of section 103-5(a) of the speedy-trial statute (725 ILCS 5/103-5(a) (West 2016)) even if a trial date has not yet been set. Therefore, a delay, to be attributable to the defense, need not result in "any movement of the trial date." It follows, by the majority's reasoning, that the trial court in this case was within its authority under section 103-5(a) to attribute the 34 days from August 21 to September 24, 2018, to the defense, even though the alibi disclosure on August 21, 2018, caused no alteration of the previously set trial date of September 24, 2018—because a delay need not result in "any movement of the trial date."
¶ 152    I believe that reasoning is flawed. I agree, however, with how the reasoning begins. I agree that by moving to suppress his or her confession, for example, a defendant can delay the trial even though, at the time of the motion, a trial date has not yet been set. See *Donalson*, 64 Ill. 2d at 542. "The mere filing" of a pretrial motion might well "eliminate[ ] the possibility that the case could be immediately set for trial." *Id.* If, afterward, the case ends up going to trial beyond the 120-day deadline (see 725 ILCS 5/103-5(a) (West 2016)) and if, on that ground the defendant moves to be discharged, the defendant will have the burden of establishing that the motion for suppression caused no delay of the trial—"which fact must be affirmatively established by the record." *People v. Oakley*, 109 Ill. App. 3d 165, 168 (1982). Usually, proving that negative will be all but impossible. The default assumption is that potentially dispositive motions filed before the scheduling of a trial take time to adjudicate and have the effect of delaying the scheduling of a trial—and, hence, the trial itself. See *Jones*, 104 Ill. 2d at 281 (concluding that "[t]he defendants have not overcome the general rule that delay occasioned by the entry of the written order on the defendants' motions is delay occasioned by the defendants"). Normally, that assumption will be unassailable. Seldom will a defendant be able to prove that if the defense had refrained from filing its pretrial motions, the trial could *not* have been scheduled for an earlier date. So, to be clear, I have no quarrel with the proposition that by filing a motion that prevents the immediate scheduling of a trial, the defense can delay the eventual trial before the trial is even scheduled. See *McDonald*, 168 Ill. 2d at 440.
¶ 153    I perceive a gap, however, between that uncontroversial proposition and a further, quite different proposition—namely, that the trial court may attribute a delay to the defense on the basis of something the defense did *after* the trial was scheduled that caused no alteration of

that already scheduled trial date. To say that the latter proposition follows from the former strikes me as a rather strained application of cases such as *McDonald*. Adding to my difficulty, case law declares over and over again that "delay" means delay of the trial.

¶ 154 "Our supreme court determined that the word 'delay,' as used in the amended version of section 103-5(a), refers to any action by either party or the trial court that moves the trial date outside of the 120-day period." *People v. Brexton*, 2012 IL App (2d) 110606, ¶ 18. Or, as the appellate court puts it in *People v. Janusz*, 2020 IL App (2d) 190017, ¶ 57, "the relevant question" under the speedy-trial statute "is whether defendant occasioned the delay in his trial." A "[d]elay is occasioned by a defendant," the appellate court continues in *Janusz*, "when his acts caused or contributed to a delay resulting in a postponement of his trial." *Id.* To quote the supreme court, the question is whether "the defendant's conduct was responsible for the *trial's* delay." (Emphasis added.) *People v. Goins*, 119 Ill. 2d 259, 268 (1988). "[I]f an accused is not brought to trial within the 120-day term and he has not occasioned any delay *in trial*, he is entitled to a dismissal of the charges [citations]." (Emphasis added.) *People v. Richards*, 81 Ill. 2d 454, 459 (1980).

¶ 155 I struggle to square the majority opinion with those authorities when the majority opinion emphatically asserts, " 'Delay' does *not* mean a delay of defendant's trial or trial date ***." (Emphasis in original.) *Supra* ¶ 82. The majority defines "delay," instead, as "a delay of the speedy-trial term." *Supra* ¶ 82. But that definition of "delay" leaves unanswered the question of when the running of the speedy-trial term should be delayed. The answer is, when the defendant does something to delay his or her trial, scheduled or not. That, it seems to me, is what the majority's own cited authorities teach, including *Lilly* and *Cordell*. *Lilly* interprets *Cordell* as "conclud[ing] that a 'delay' is '[a]ny action by either party or the trial court that moves the trial date outside of [the] 120-day window.' " *Lilly*, 2016 IL App (3d) 140286, ¶ 34 (quoting *Cordell*, 223 Ill. 2d at 390).

¶ 156 Like the defendant in *Boyd*, defendant in the present case has affirmatively demonstrated, from the record, that his supplemental discovery disclosure did not change his already scheduled trial date and, therefore, did not move his trial date outside the 120-day window or contribute to doing so. See *Oakley*, 109 Ill. App. 3d at 168. In that respect, defendant has carried his burden. He has made the required showing from the record. As the appellate court observes in *Boyd*, with what seems to me impeccable logic, "unless the trial date is postponed, there is no delay to attribute to [the] defendant." *Boyd*, 363 Ill. App. 3d at 1037.

¶ 157 In this context, "the trial date" does not necessarily mean a date already written on the calendar but means, more broadly, the date of the trial or when the trial ultimately takes place. The majority criticizes *Boyd* as holding that "a delay could only be attributable to a defendant if a set trial date was in fact moved." That seems to me a misreading of *Boyd*. For one thing, *Boyd* does not use the term "set trial date." For another thing, trials generally are not scheduled at the arraignment, and *Boyd* holds that "any delay resulting from a defendant's failure to proceed with an arraignment is chargeable to the defendant." *Id.* As far as I can see, nowhere does *Boyd* state that a trial has to be scheduled to be delayed. Rather, *Boyd*'s point is simply this: "Our supreme court has consistently held that a *delay* is occasioned by the defendant and charged to the defendant when the defendant's acts caused or contributed to a *delay resulting in the postponement of trial*." (Emphases in original.) *Id.*

¶ 158     Defendant's disclosure of the alibi witness, Naomi Cross, resulted in no postponement of the trial. That is clear from the record. Thus, the circuit court abused its discretion by attributing the 34 days from August 21 to September 24, 2018, to defendant.

¶ 159     The majority suggests that "*some* support" for the trial court's decision "*may* be found" (emphases added) (*supra* ¶ 100) in the catchall phrase of Illinois Supreme Court Rule 415(g)(i) (eff. Oct. 1, 1971), which authorizes a trial court to respond to discovery noncompliance by "enter[ing] such other order as it deems just under the circumstances." (Emphases added.) The noncommittal language that the majority uses in this context is understandable. As far as I know, no case has ever interpreted Rule 415(g)(i) as permitting a trial court to deprive a defendant of his or her statutory right to a speedy trial as punishment for a discovery violation that caused no delay of the trial. I am aware of cases holding, reasonably enough, that if a defendant's noncompliance with discovery necessitates a continuance of the trial, the trial court may attribute the delay to the defense. See *People v. Tally*, 2014 IL App (5th) 120349, ¶ 30 (holding that, in response to a discovery violation by the defense, the circuit court should have done as the defendant's attorney had suggested: continue the bench trial and attribute the delay to the defense). In support of its tentative interpretation of Rule 415(g)(i), the majority quotes from *Murphy*, 47 Ill. App. 3d at 283: "The defendant's failure to comply with the trial court's discovery order *** constituted delay attributable to defendant." The majority, however, does not quote the appellate court's framing of the issue at the beginning of the paragraph in *Murphy*: "The question has arisen in this regard as to whether or not a *delay in trial* is attributable to defendant for its handling of discovery." (Emphasis added.) *Id.* at 282. The *Murphy* court asked the same question with respect to a motion for suppression that the defendant had filed: "whether or not a motion to suppress evidence constitutes *delay in trial* caused by the defendant." (Emphasis added.) *Id.*

¶ 160     In short, my point is this. The speedy-trial statute should be liberally construed in the defendant's favor. *People v. Bauman*, 2012 IL App (2d) 110544, ¶ 16. Construing the statute as tolling the 120-day period for conduct by the defendant that, demonstrably from the record, had no effect on the date of the trial is not construing the statute liberally in the defendant's favor. I know of no case holding that a trial court may attribute a delay to a defendant even though the record shows that the conduct in question did not delay the trial. See *People v. Staten*, 159 Ill. 2d 419, 426 (1994) (explaining that "[p]roof of a violation of the statutory right requires only that the defendant has not been tried within the period set by statute and that defendant has not caused or contributed to the delays"); *People v. Nunnery*, 54 Ill. 2d 372, 375-76 (1973) (explaining that "[t]he controlling question in determining if the defendant was entitled to discharge under the 120-day rule is whether the *delay of the trial* beyond 120 days was 'occasioned by the defendant,' and if answered affirmatively, he was not entitled to discharge" (emphasis added)).

¶ 161     Case law gave ample notice that a defendant was responsible for "delay" within the meaning of the speedy-trial statute only if the defendant had caused or contributed to a postponement of his or her trial beyond the 120-day term. See, *e.g.*, *Kliner*, 185 Ill. 2d at 114 (holding that "[a] delay is occasioned by the defendant and charged to the defendant when the defendant's acts caused or contributed to a delay resulting in the postponement of trial"); *People v. Murray*, 379 Ill. App. 3d 153, 158-59 (2008) (same).

          " ' 'An attorney's failure to seek discharge of his client on speedy-trial grounds generally will be deemed ineffective assistance of counsel if there is a reasonable

probability that the defendant would have been discharged had a timely motion for discharge been made and no justification has been proffered for the attorney's failure to bring such a motion." ' " Murray, 379 Ill. App. 3d at 158 (quoting *Boyd*, 363 Ill. App. 3d at 1034, quoting *Staten*, 159 Ill. 2d at 431).

¶ 162    Apropos reasonable probability, here is my speedy-trial arithmetic. The 18 days from July 9 to 27, 2017, are attributable to the State. Also, the 113 days from July 16, 2018, to the beginning date of the jury trial, November 6, 2018, are likewise attributable to the State. The total comes to 131 days (113 plus 18 equals 131). The statutory speedy-trial deadline of 120 days was missed. See 725 ILCS 5/103-5(a) (West 2016). That much was clear under *Boyd* and the supreme court cases that it cites. I would hold that by neglecting to file a motion for discharge and by failing to raise, in the posttrial motion, the statutory speedy-trial violation, defense counsel rendered ineffective assistance. The remedy that case law prescribes is reversal. See *People v. Mooney*, 2019 IL App (3d) 150607, ¶ 31.